96 S.W.3d 256 (2002)
In the Interest of J.F.C., A.B.C., and M.B.C., Minor Children.
No. 01-0571.
Supreme Court of Texas.
Argued September 4, 2002.
Decided December 31, 2002.
Rehearing Denied March 6, 2003.
*259 Idolina Garcia, Office of the Attorney General of Texas, Julie Caruthers Parsley, Office of the Solicitor General of Texas, Jeffrey S. Boyd, Office of the Attorney General, John Cornyn, Attorney General of the State of Texas, Howard G. Baldwin, First Assistant Attorney General, Austin, James Wiley, Assistant Criminal district Attorney, Amy Innmon Forrester and Thomas C. West, Waco, for Petitioners.
Nita C. Fanning, Kathryn J. Gilliam, Waco, L. T. "Butch" Bradt, Houston, and Joseph M. Layman, Waco, for Respondent.
Justice OWEN delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice JEFFERSON, and Justice SMITH joined.
After a jury trial, the trial court in this case rendered a judgment terminating the rights of both the mother and father to three of their children. A divided court of appeals reversed and remanded, holding that omission of an instruction that termination must be in the children's best interest from material parts of the jury charge was fundamental error that could be raised for the first time on appeal, and that the error probably caused rendition of an improper judgment.[1] We hold that:
1) although the trial court's charge was erroneous because it omitted the children's best interest as a prerequisite for termination in material parts of the charge, Texas Rule of Civil Procedure 279 requires us to supply the omitted finding in support of the judgment because there is either an express or deemed finding by the trial court that termination is in the children's best interest;
2) the concept of "fundamental error" cannot be used to circumvent the application of Rule 279 of our rules of procedure;
3) applying Rule 279 does not violate the due process clause of the United States Constitution or due course of law provision of the Texas Constitution;
4) because parental conduct on which termination could be based was conclusively established, we do not reach whether the trial court erred in failing to instruct the jury that the same ten jurors must agree that at least one statutorily described course of parental conduct occurred and that termination is in the best interest of the children; and
5) assuming, without deciding, that a judgment could be set aside in a parental *260 termination case based on ineffective assistance of a parent's counsel, assistance of counsel in this case was not ineffective.
The factual sufficiency issues raised by the parents in the court of appeals pertain to a ground of termination that is unnecessary to the trial court's judgment. The remaining issues raised by the parents do not require reversal of the trial court's judgment terminating the parents' rights. Accordingly, we reverse the court of appeals' judgment and render judgment that the parent-child relationships are terminated.

I
Because we consider the record in this case in some detail later in this opinion, we include here only minimal facts and the procedural history. The three children who are the subject of this proceeding were removed from their parents' home by the Texas Department of Protective and Regulatory Services (DPRS) in October 1997. At that time, the children's respective ages were four years, two years, and seven months.
The children were initially removed without a court order.[2] The next day, the trial court held an emergency removal hearing and appointed the DPRS temporary managing conservator of the children.[3] Five days later, the court held an adversary hearing, continued the removal, and issued temporary orders appointing the DPRS temporary managing conservator.[4]
The trial court thereafter entered various orders directing the parents to perform specific acts to avoid restriction or termination of their parental rights. After working with the family for six months following the children's removal, the DPRS amended its petition in the trial court to seek termination of both parents' rights. A jury trial was held in February 1999, and the trial court rendered judgment in March 1999 terminating the parent-child relationship between each parent and the three children who had been removed from the home seventeen months earlier, in October 1997. A fourth child had been born in January 1999 shortly before trial. That child was removed from the parents at birth but was not the subject of any of the proceedings in this case.
The parents appealed, and the court of appeals, with one justice dissenting, reversed the trial court's judgment and remanded the case for a new trial. The court of appeals concluded that the charge permitted the jury to find that the parents' respective rights should be terminated without finding that termination would be in the children's best interest. Although the parents had not objected to the charge on this basis, the court of appeals held that the omission went to a "core issue" in a termination case, and that failing to review the unpreserved error on appeal would violate "Fourteenth Amendment procedural due process" requirements under the United States Constitution.[5] The parents had also complained for the first time on appeal that it was error in a parental termination case to use broad-form submission because less than ten jurors could rely on one basis for termination while other jurors could rely on another basis.[6] The parents contended that there must be a separate finding with regard to each *261 element necessary for termination.[7] The court of appeals rejected these arguments, concluding that broad-form submission was permissible.[8] The dissent would have affirmed the trial court's judgment on the basis that there was either an express or implied finding that termination of parental rights was in the children's best interest.[9]

II
We first consider the jury charge's submission of the best interest of the children. There is no indication in the record that the trial court or any counsel in the case was under any misapprehension that there are two prerequisites for termination of parental rights under section 161.001 of the Texas Family Code. Section 161.001 sets forth nineteen different courses of parental conduct, any one of which may satisfy the first prerequisite for termination. The second prerequisite under section 161.001 is that termination must be in the child's best interest. However, the written charge to the jury in this case omitted the children's best interest as an element in three material parts of the charge, perhaps because of a typographical error. The submission of the termination issues was as follows:
With regards to [THE MOTHER], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that she has done at least one of the following:
1) Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
OR
2) Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child.
With regards to [THE FATHER], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that he has done at least one of the following:
 Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;
OR
 Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child. For the parent-child relationship to be terminated in this case, it must also be proved by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children.
Some factors to consider in determining the best interest of the child are:
1. the desires of the child,

*262 2. the emotional and physical needs of the child now and in the future,
3. any emotional and physical danger to the child now and in the future,
4. the parenting ability of the individuals seeking custody,
5. the programs available to assist those individuals to promote the best interest of the child,
6. the plans for the child by those individuals or by the agency seeking custody,
7. the stability of the home or proposed placement,
8. the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and
9. any excuse for the acts or omissions of the parent.
QUESTION 1:
Should the parent-child relationship between [THE MOTHER] and [J.F.C.] be terminated?
Answer "Yes" or "No."
Answer:
[similar questions as to the other two children]
QUESTION 4:
Should the parent-child relationship between [THE FATHER] and [J.F.C.] be terminated?
Answer "Yes" or "No."
Answer:
[similar questions as to the other two children]
The charge would have accurately instructed the jury regarding the children's best interest if a hard return had been inserted in the instruction regarding the father just before the words "For the parent-child relationship to be terminated...." But as can be seen, the written instruction regarding the father's parental rights mentioned the best interest of the children only in connection with one of the two alternative descriptions of parental conduct. The jury was free to conclude that if the father had endangered the children, his rights could be terminated without any consideration of the children's best interest. Because of the way the written charge was structured, the factors the jury was to consider in determining the best interest of the children were referable only to whether the father had failed to comply with a court order establishing the actions necessary for return of the children.
The written instruction to the jury regarding the mother's parental rights omitted any reference to the best interest of the children. The jury was instructed that her rights could be terminated if there was clear and convincing evidence that she either engaged in conduct that endangered the children or failed to comply with a court order establishing the actions necessary for the return of her children.
Accordingly, the charge in this case omitted a statutorily prescribed element for parental termination. There was no objection to this omission.

A
Rule 279 of the Texas Rules of Civil Procedure prescribes the consequences for failing to object to the omission of an element of a ground of recovery. The current version of Rule 279, like its predecessor, embodies long-standing case law that when some but not all elements of a claim or cause of action are submitted to and found by a jury, and there is no request or objection with regard to the missing element, a trial court may expressly make a finding on the omitted element or, if it does not, the omitted element is deemed found by the court in a manner supporting the judgment if the deemed *263 finding is supported by some evidence.[10] Rule 279 thus directs courts how to proceed when an element of a "ground of recovery or defense" is omitted from a jury charge.[11]
In this case, the trial court's judgment contains an express finding that termination is in the best interest of the children. It recites that
the Court having reviewed the said verdict of the Jury and the pleadings and the evidence herein is of the opinion that the Petitioners are entitled to the judgment of termination with regard to the children in whose interest this suit is brought, and that such judgment is in the best interest of the children in whose interest this suit is brought.
There is no indication in the record that this finding was made at the request of either party, or after notice and hearing before rendition of judgment, as Rule 279 contemplates.[12] However, there was no objection to the inclusion of this finding in the judgment.
But irrespective of whether that written finding satisfies Rule 279 regarding an express finding, the "omitted element or elements shall be deemed found by the court in such manner as to support the judgment"[13] if there is evidence to support such a finding.[14] Because the judgment terminated parental rights, we must determine whether there is evidence to support a deemed finding that termination is in the children's best interest.
Due process requires the application of the clear and convincing evidence standard of proof in parental termination cases.[15] This Court has looked to the United States Supreme Court in articulating what the "clear and convincing evidence" standard means.[16] And, following *264 this Court's decision in In re G.M., 596 S.W.2d 846 (1980) the Legislature amended the Texas Family Code to change the burden of proof in termination cases from a preponderance of the evidence to clear and convincing evidence.[17] The Family Code defines clear and convincing evidence in the same manner that this Court has defined that burden of proof: "`Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[18]

B
We have never considered how to apply the overlay of the clear and convincing evidence burden of proof onto our legal sufficiency, also known as our "no evidence," standard of review in cases other than defamation cases.[19] However, just recently, in a parental termination case, this Court was called upon to determine how the clear and convincing evidence standard must be applied in a factual sufficiency review.[20] We held in In re C.H., 89 S.W.3d 17 (2002) "that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations."[21] We expressly "reject[ed] standards that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof."[22] We concluded that "the burden of proof at trial necessarily affects appellate review of the evidence."[23] We explained:
Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. But that standard is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing. As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.[24]
The same logic dictates the conclusion that our traditional legal sufficiency standard, *265 which upholds a finding supported by "[a]nything more than a scintilla of evidence,"[25] is inadequate when the United States Constitution requires proof by clear and convincing evidence. Requiring only "[a]nything more than" a mere scintilla of evidence does not equate to clear and convincing evidence.
We find support for this conclusion, by analogy, in the United States Supreme Court's decision in Jackson v. Virginia.[26] In the criminal, habeas corpus context, the Supreme Court held in Jackson that the "no evidence" test it had previously articulated in Thompson v. Louisville[27] was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt" because "`[a] mere modicum of evidence may satisfy a `no evidence' standard.'"[28] The Court defined a "mere modicum" of evidence to include "[a]ny evidence that is relevant that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence."[29] The Court concluded that "it could not seriously be argued that such a `modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt."[30] The Court explained further:
Application of the Thompson [no evidence] standard to assess the validity of a criminal conviction after Winship could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of Winship.[31]
The availability of habeas review has since been limited by the United States Supreme Court, but a majority of the Court has not modified the Jackson standard of review when the merits of a habeas petition are reached.[32]
The reasoning in Jackson reinforces our conclusion that to apply our traditional no evidence standard of review in a parental termination case would not afford the protections inherent in the clear and convincing standard of proof. As the example in Jackson highlights, a parent's rights could be terminated based on "but one slender bit of evidence" as long as the jury was properly instructed on the clear and convincing evidence burden of proof. Our legal sufficiency review, therefore, must *266 take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.
The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed. In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.[33] Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.[34]
In a factual sufficiency review, as we explained in In re C.H., a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.[35] We also explained in that opinion that the inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations."[36] A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.[37] A court of appeals should *267 detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.
A number of our courts of appeals held, prior to our decision in In re C.H.,[38] that a legal sufficiency review in a case in which the burden of proof is clear and convincing evidence is the same as in a case in which the burden of proof is a preponderance of the evidence.[39] We disapprove of those decisions' articulation of the standard of review on appeal. At least five courts of appeals' decisions have concluded that a heightened standard of review applies when the burden of proof is clear and convincing evidence,[40] but the standards they articulated differ in varying degrees from our holdings in In re C.H.[41] and in this case today.
We note that the parents have not argued that the United States Constitution requires appellate courts to conduct a de novo review in parental termination cases like the de novo review that the United States Supreme Court has held is required in defamation cases[42] and for punitive damage awards.[43] The parents' only constitutional *268 challenge regarding the best interest of the children is that violations of due process under the federal Constitution and of the due course of law provision in our state Constitution have occurred because there is no specific finding answered by the jury that termination is in the children's best interest. We consider this argument is section II.D. below. In the absence of any contention that the federal constitution requires a de novo review of the evidence, we leave open, as we did in In re C.H., whether the United States Constitution requires the type of review set forth by the United States Supreme Court in Harte-Hanks[44] and Bose,[45] and if so, whether the standards we have set forth above would comport with the de novo review required by those decisions.
Finally, we note that our decision in Garza v. Maverick Market, Inc.[46] is distinguishable. Garza concerned a wrongful death claim by an illegitimate child. This Court reaffirmed its prior holding in Brown v. Edwards Transfer Co.[47] that "[i]f paternity is questioned in a wrongful death action, the alleged child would have to prove by clear and convincing evidence that he is a filial descendant of the deceased."[48] Our Court had adopted the clear and convincing evidence standard in such cases to maintain consistency with the Legislature's choice of the clear and convincing evidence standard in connection with other legitimacy issues under the Probate Code and the Family Code.[49] The United States Supreme Court had not mandated a clear and convincing evidence burden of proof. Accordingly, this Court, not the federal constitution, imposed a clear and convincing burden of proof in Garza. The Court's statements in Garza that if there is "some evidence," the case must go to the jury, that "we `consider all of the evidence in the light most favorable to the plaintiff, disregarding all contrary evidence and inferences,'" and that "[t]he question of whether the evidence clearly and convincingly prove[s paternity is] a question for the jury to determine,"[50] do not control when, as here, we are considering a constitutionally mandated clear and convincing evidence burden of proof.
We turn to evidence in this case of whether termination is in the children's best interest.

C
In applying the standards set forth above, we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence. We do not consider evidence that a factfinder reasonably could have disbelieved.
Child Protective Services (CPS) began monitoring the parents and offering services on a continuing basis in March 1997. At that time, there were three children. J.F.C. was four years old, A.B.C. was two and one-half years old, and M.B.C. had just been born. The family lived on the campus of the Texas State Technical College.
The incident that gave rise to CPS's continual monitoring of this family was a report that the parents "had serious drug problems" and that they were physically abusive to one another. An investigator went to the home to meet with the parents *269 and examine the children. After initially refusing to permit the investigator to see the three children, the parents ultimately allowed the investigator to examine the oldest child and the infant. The investigator did not see any indication of abuse or neglect of these two children and noted that J.F.C. seemed happy. However, the parents told the investigator that two-and one-half-year-old A.B.C. was with a babysitter and was therefore unavailable for examination. The CPS investigator went to the babysitter's home, but she denied having seen the child that day. CPS then contacted the Texas State Technical College police, who accompanied the CPS investigator back to the family's home. It was only then that the parents produced A.B.C., and the investigator learned that the mother had hit A.B.C., leaving dark bruises surrounding the outside of the child's eye.
In an interview shortly after CPS discovered that A.B.C. had been abused, the father told a CPS counselor that his wife (the children's mother) was "very physically violent" and physically attacked him. He also said he was concerned for the safety of his children because their mother brought other men home and had sexual relations with them. There were also other people living in the home whom the father said he did not trust. Both parents admitted that during one of their many arguments, the mother had chipped or knocked out one of the father's teeth.
During April 1997, the parents also admitted to being under the influence of illegal drugs while watching the children, and CPS learned that the mother had tested positive for cocaine and methamphetamines shortly after M.B.C.'s birth a month earlier in March 1997. When asked about their drug use at trial, both parents said that they used cocaine while the children were at home and in their care. The mother further admitted to using cocaine within two weeks after giving birth to M.B.C., but she then testified that her children were safe in her care when she was using cocaine because the drug made her "more aware of [her] surroundings" and that they weren't endangered "even a little bit" when both parents were "high on drugs." The father in turn testified that God made cocaine available to him in times of grief and pain and that he was always able to supervise the children in a very caring manner even when he was under the influence of narcotics.
Although CPS knew of the drug use and some of the family violence as early as April 1997, it concluded that removal of the children was not justified because they were not in immediate danger. CPS instead implemented a Child Safety Evaluation and Plan in April 1997. The mother submitted to a psychological exam in compliance with this plan, and based on the results, CPS concluded that she was not "an immediate threat of harm to the children." Because the father refused to submit to a psychological exam, CPS referred the case to what it called "family preservation" in July 1997. The next month, the father did submit to a psychological exam, and based on the results of his and the mother's exam, family preservation recommended counseling.
A Family Service Plan was established in August 1997, five months after the initial instance of child abuse in March of that year. The plan established tasks for each parent, including drug assessments, individual counseling, and marriage counseling. The mother attended three of four scheduled sessions, but the father attended only one before the children were removed in October 1997.
Between April and early October of that year, CPS found no further indication of physical abuse of the children during home *270 visits. However, there was evidence of continued and escalating hostility between the parents from April of 1997 until October 22, 1997, when the children were removed from the home. CPS case workers witnessed arguments and hostility and met with each parent separately during home visits in order to be able to communicate with them. Because of the continual arguing between the parents, CPS recommended day care for the children, to which the parents agreed. Day care commenced the first week of October, but a few days later, another incident of physical abuse of A.B.C. occurred. The parents had arrived to pick up A.B.C. at day care, and the child began what the mother described as a "temper tantrum." A heated argument between the parents ensued, and the mother grabbed A.B.C. by the throat and face and shoved him into a car seat. A.B.C. later told a case worker that this hurt his neck, and an investigator subsequently found a mark on A.B.C.'s forehead and fingernail scratches on his neck. The children's attendance at day care thereafter was sporadic because the parents would not take them, even after CPS offered to provide transportation.
There was testimony at trial from Texas State Technical College police officers about domestic disturbances. Their records indicate that they responded to fourteen reports of violence at the family's home. The mother testified that the police came to their home between ten and fifteen times because she and her husband (the father of the children) were "extremely angry and arguing." Some of the visits by the campus police occurred before the DPRS removed the children and while the children were in the home. One of the officers testified that he had been to the home to respond to domestic disturbances and had seen three children. He always checked the children, and there were no signs of physical harm. He described the parents as "venomous" towards one another, and testified that the children definitely heard their fighting. The officer urged the mother many times to seek counseling, identifying several on- and off-campus sources, and at least once offered "any type of assistance [to the father] to overcome any problems."
On two other occasions, in August and October 1997, just before the children were removed, campus police officers went to the home because of domestic violence disturbances. On both occasions, the parents were upset, arguing loudly, and could not communicate with one another. The children were not at home during the latter incident. About a year and a half earlier, in 1996, campus police had given the mother and two of the children a ride home because the father had left them "on foot." (M.B.C. had not yet been born.)
The day the children were removed from the home (twelve days after the car seat incident), the father called the CPS case worker. The father was "very irate" and was "shouting ... that ... he wasn't going to be responsible for the children" and that he was "getting out of there." While the father was on the phone, the case worker heard an argument between the parents that was escalating. When the phone abruptly went dead, the case worker immediately went to the home. When he arrived, the father had left. The mother was very agitated and highly emotional. She complained about A.B.C., who was almost three years old at this point, saying that he "yelled and screamed all the time," that he "threw fits," that "[n]obody could control him or calm him down," and that she "just didn't know what she was going to do." The case worker took the children to day care, found the father, and brought both parents to his office. The parents did not calm down. CPS concluded that it would be unsafe for the children to go *271 home to the parents in that state and asked the parents if there were relatives who could take the children. The mother gave them the name of one person, who declined to provide care for the children. Neither parent could offer any other names. The children remained with CPS that day, and the parents went home. CPS attempted to contact the parents for several days thereafter without success to arrange a visit with the children.
At this point, the DPRS petitioned the trial court to be appointed as temporary managing conservator of the children. The trial court ultimately entered a series of orders setting forth specific actions that each parent was to take. The orders advised the parents that if they did not comply, their children might not be returned and their parental rights could be terminated. The parents both testified at trial that they understood what the orders required and the consequences of noncompliance. The parents also testified that they did not comply with many provisions of family preservation plans CPS had implemented prior to removal of the children. As detailed in section III below, the parents consciously failed to comply with material provisions of the trial court's orders. Each parent was ordered to pay child support in the amount of $100 per month, not for each child, but for all three. The mother testified that although she could financially afford it, she deliberately chose not to pay child support because she believed that she should not have to. The father gave similar testimony. Both parents refused to attend any parenting classes or to attend individual counseling sessions. The father testified that he continued to use illegal drugs. The mother became pregnant with the couple's fourth child, and although ordered by the trial court to obtain prenatal care, she did not do so for the first six months of her pregnancy.
After the children were removed from the home, violence between the parents continued. Seven days after the children were removed, a Texas State Technical College Police officer was again called to the home after a female's screams had been heard. When the responding officer approached the home, the father would not allow him to enter and insisted that the mother was not there. The father was "violent, screaming, yelling, cussing, belligerent, [and] uncooperative." The officer called the father on the phone, and the father continued to insist that the mother was not at home. It was only after the Waco SWAT team arrived that an agreement was reached by phone with the father. He and the mother then appeared at a picture window to show the officers that had gathered at the scene that the mother was not physically harmed.
On another occasion, campus police responded when the father had locked the mother out of the home during an argument even though she was stark naked. She broke a window with her hand and arm to gain re-entry and was cut and bleeding.
Campus police officers also responded to a call eight months after the children were removed when the father struck an eight-year-old neighbor. The police ultimately termed it an accidental striking, even though the father had threatened to hit the child right before he accidentally hit her. The father was, however, arrested on this occasion for evading detention. The record does not provide details of all fourteen responses by campus police to the home, but an officer described the father as "angry and explosive" and the mother as "[a]ngry, belligerent, nervous, [and] argumentative" in his dealings with them.
There was considerable expert testimony at trial that related to the children's *272 best interest. One expert testified that the physical violence and verbal confrontations in the home had a negative emotional impact on the children. A.B.C. told this licensed counselor that he had seen his parents hit one another and that his father had hit him with a baseball bat. A.B.C.'s play consisted of male characters hitting female and child characters. One CPS worker observed visits between the parents and the children after their removal. She said these visits tended to be "chaotic" and that the children's behavior deteriorated after each visit. And there was testimony that the children displayed no distress at being separated from their parents.
A psychologist with over thirty years experience also evaluated both parents. In addition to taking the history of each parent, a battery of formal tests was conducted. This expert concluded that the mother had "manic tendencies, tendencies toward cycles of explosive behavior followed by periods of calm." He did "not see any real potential for change. I'd have to say her potential is extremely limited." When asked if the mother "is a fit parent or could she be," this expert said, "[t]here are too many concerns about aggression and violence and hostility as well as documented things in the history that are giant red flags in regard to parenting, and I would have to say, no, she doesn't have that capacity." There was extensive, detailed testimony about the mother's responses to various questions and standardized tests that directly related to violence. She also revealed that at some time in the recent past, she had hit a 22-month-old child when she was babysitting.
This same expert testified that during the psychological testing of the father, the father reported an "extensive drug history," including the use of LSD, amphetamines, cocaine, and marijuana. The expert also testified that psychological testing and medical history indicated that the father suffered from a bipolar disorder and that an unmedicated individual with bipolar disorder who was using "street drugs" was "extremely dangerous." The doctor testified that he recommended that the father see a psychiatrist who could prescribe medication, but he testified that he believed the father would not comply in taking the medication because he, like other individuals with bipolar disorder, prefers the excitement of the unmedicated state. The expert concluded that the father was "a very troubled individual," and the expert was "most concerned about the potential for violence, especially since there were so many areas where family conflict was noted." The expert further testified that the father's responses to items on a standardized test that related to sexual deviance raised concerns about parenting potential.
There was undisputed evidence that does not support a finding that termination was in the children's best interest. About a year after the children were removed from the home, the parents moved to Austin. The mother found work there. The parents' landlord in Austin testified that their home was a "safe environment." The obstetrician who attended the birth of their fourth child described the parents as "an appropriate, courteous, and loving couple." There was also evidence that after this termination case was set for trial, the parents made attempts to comply with some parts of the trial court's order. But in spite of this evidence, a factfinder could reasonably form a firm belief or conviction that termination was in the children's best interest.

D
The parents have asserted that the omission of the children's best interest *273 from the jury charge violated the due process clause of the United States Constitution[51] and the due course of law provision of the Texas Constitution.[52] That argument was not preserved in the trial court. But assuming, without deciding, that this complaint could be raised for the first time on appeal, the argument has no merit. Applying Rule 279 to deem a finding in support of a judgment in a parental termination case does not violate the due process clause of the United States Constitution or the due course of law provision of the Texas Constitution.
The United States Supreme Court has held in Santosky v. Kramer that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." [53] In the termination context, due process "turns on a balancing of ... `three distinct factors.'"[54] Those factors are: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure."[55]
In a parental termination case, the private interest affected is the right of a parent to raise his or her child, which is undeniably "an interest far more precious than any property right."[56] The Supreme Court has correctly observed that "[w]hen a State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."[57] The Supreme Court has thus termed the private interest in a parental termination case "a commanding one."[58]
The second factor identified by the Supreme Court in Santosky is "the risk of error created by the State's chosen procedure."[59] On balance, the risk of error caused by Rule 279 is not substantial. Rule 279 deems a finding on an element of a claim only after a full trial on the merits. Rule 279 does not deem an omitted finding in support of the judgment if the parent has objected to the omission or requested a proper submission. And, more importantly, an omitted finding may be supplied by an express finding of the trial court or a deemed finding only if that finding is supported by evidence. In a parental termination case, that evidence must be clear and convincing. A parent may raise legal and factual sufficiency challenges even after the verdict is rendered, and an appellate court will review those challenges on appeal, including the challenges to the legal and factual sufficiency of the evidence supporting the omitted finding. On appeal, the courts also consider whether the evidence was clear and convincing.[60]
In this case, the parents' motion for new trial asserted that the evidence was factually insufficient to support a finding that the parents had endangered the children or had failed to comply with court orders specifying the actions they were to take in order to have their children returned. *274 There was an opportunity to challenge the legal and factual sufficiency of the evidence regarding the best interest of the children, but the parents did not avail themselves of that opportunity in the trial court. Nor have they challenged legal or factual sufficiency regarding the best interest of the children in the court of appeals or this Court.
The third due process factor identified in Santosky is the governmental interest supporting use of the challenged procedure.[61] The government has a substantial interest in preventing retrial of a case when 1) some but not all elements of a termination action have been submitted to and found by a jury based on clear and convincing evidence or have been established as a matter of law, 2) the trial court renders judgment on the jury's verdict, and 3) there is clear and convincing evidence to support a finding of the missing element. Parents and children also have an interest in resolving termination proceedings as expeditiously as reasonably possible. A retrial results in prolonged uncertainty and disruption in the lives of the parents and children who are involved. The government has a legitimate interest in encouraging a parent to object in the trial court if a statutorily prescribed element of a termination action has been omitted from the court's charge rather than challenging the omission for the first time on appeal. A trial court can easily cure an omission in its charge to the jury if that omission is called to its attention before the case is submitted.
For these reasons, Rule 279 does not deprive the parents of due process or due course of law.

E
The dissenting opinions would resolve this case by analyzing whether an omission of an element of a claim in a jury charge is fundamental error. Justice Schneider's dissenting opinion urges the Court to do so in order to provide "guidance for practitioners and lower courts."[62] But the importance of an issue asserted by a party cannot justify ignoring applicable rules of procedure that bind this Court.
Rule 279 requires a reviewing court to supply an omitted finding in support of the trial court's judgment where, as here, there was no objection to the omission in the trial court, and some (in this case clear and convincing) evidence supports the omitted finding. This Court must apply the rules of civil procedure unless a constitutional provision or statute requires us to do otherwise. Justice Hankinson's dissent incorrectly asserts that we are considering unpreserved error. Appellate courts should not reverse a trial court's judgment in violation of Rule 279 any more than appellate courts should reverse a trial court's judgment for error that was harmless. Rule 279 applies just as Texas Rule of Appellate Procedure 44.1 applies.
Justice Hankinson's dissenting opinion seems to reason that since it concludes that the error in omitting an element of a claim was fundamental error, the charge should be reviewed as if an objection had been made. But this reasoning is circular since the fact that no objection was made is precisely why Rule 279 applies. Because of the operation of Rule 279, we have a very narrow question before us regarding "fundamental error." That question is whether the notion of "fundamental error" can be used to circumvent the operation of Rule 279 when a party fails to object to the *275 omission of an element of a claim against that party. We answer that question "no." Assuming, without deciding, that the formulation of fundamental error in Justice Hankinson's dissenting opinion is correct, deeming an omitted finding in support of a judgment in a parental termination case when that finding is supported by clear and convincing evidence does not adversely affect any "fundamental public policy" found in the Texas Constitution or statutes.[63] Giving full effect to Rule 279 simply means that a court, rather than a jury, has supplied a finding that is supported by clear and convincing evidence on one of the elements of parental termination. Neither the Texas Constitution nor any statute prohibits a bench trial of one or more issues in a termination case when there has been no objection by the parent.
To put this in perspective, suppose that a parent had requested a jury trial, but then failed to object when the trial court conducted a bench trial instead of empaneling a jury, entered findings of fact and conclusions of law, and rendered judgment terminating the parent-child relationship. Would we say that the parent could argue for the first time on appeal that his or her right to a jury trial had been denied because this was fundamental error? The answer to that question is "no."
Justice Hankinson's dissenting opinion concludes that the error in the charge was harmless because "the focus" of the trial was the children's best interest.[64] Justice Hankinson's dissent seems to be saying that in spite of what the jury was told in writing by the trial court's charge, the omission of the children's best interest in three of four material parts of the charge was cured because there was so much evidence and argument from counsel about the children's best interest, the jury must (somehow) have understood that it could not find that the parent-child relationships should be terminated unless it concluded that termination was in the children's best interest.
While we agree that there was legally sufficient clear and convincing evidence that termination was in the children's best interest, most of the evidence relevant to the best interest of the children was also relevant to the grounds for termination based on the parents' conduct set forth in the charge. The jury was not told that it had to reach separate, distinct conclusions not only that there were grounds for termination based on the parents' conduct, but also that termination would be in the children's best interest. The jury was specifically instructed that the best interest of the children must be found in connection with only one of the four grounds for terminating based on parental conduct.

F
The record before us does not require a remand to the court of appeals for a factual sufficiency review of the deemed finding that termination was in the children's best interest. In the absence of a challenge to the factual sufficiency of the evidence, appellate courts must deem an omitted finding in support of a judgment if there is some evidence[65] (in this case clear and convincing evidence) to support the *276 omitted finding and the other requirements of Rule 279 have been met.
Rule 279 permits a trial court to make an express finding on an omitted element if there is "factually sufficient evidence to support a finding."[66] If the trial court does not make an express finding, "such omitted element or elements shall be deemed found by the court in such manner as to support the judgment."[67] Rule 279 applies to deemed findings in a jury trial and is a parallel to Rule 299, which applies to deemed findings in a bench trial. Rule 299 provides: "where one or more elements thereof have been found by the trial court, omitted unrequested elements, where supported by evidence, will be supplied by presumption in support of the judgment."[68] The history of the rules that require deemed findings in both jury and bench trials do not indicate that there is to be any difference in the application of these rules in requiring a court to deem a finding.[69] It is only when there has been a factual sufficiency challenge that is preserved in the trial court that a deemed finding must be reviewed for factual sufficiency on appeal.[70]
The parents in this case have not contended in the trial court, the court of appeals, or this Court that the evidence is factually insufficient to support a finding that termination is in the children's best interest. Accordingly, we need not address whether factual sufficiency of evidence may be raised for the first time on appeal in a parental termination case.[71] The inquiry in this appeal is limited to whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children. The trial court's deemed finding that termination is in the best interest of the children is supported by legally sufficient clear and convincing evidence.

*277 III
The parents have an additional complaint about the jury charge. There are two predicates to parental termination under section 161.001 of the Texas Family Code. The first is that one or more courses of parental conduct must be established. The second is that termination must be in the best interest of the children. The gravamen of the parents' complaint is that the charge does not require the same ten jurors to agree that a parent engaged in at least one particular course of conduct described by section 161.001(1) and that termination is in the children's best interest. The charge only requires that ten jurors agree that the parent-child relationships should be terminated.[72] They thus contend that this broad-form submission did not satisfy federal due process requirements.
This constitutional challenge was not raised in the trial court. However, even assuming, without deciding, that 1) this argument could be raised for the first time on appeal, and 2) the charge erred in this regard, we do not reach the constitutional challenge because the evidence conclusively establishes that each parent engaged in a course of conduct described by subsection 161.001(1) of the Family Code. Therefore, the alleged error did not cause the rendition of an improper judgment or prevent the parents "from properly presenting the case to the court of appeals."[73]
Paragraph (O) of subsection 161.001(1) provides that one basis for establishing the parental conduct prong required for termination of parental rights is that a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [DPRS] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." The State relied on subsection (O) as one of two alternate grounds of parental conduct that could support termination.
It is undisputed that both parents failed to comply with numerous, material provisions of court orders that specifically required their compliance to avoid restriction or termination of their parental rights. During the sixteen-month period between the time the DPRS removed the children and the time of trial, the trial court entered four separate orders.[74] Each order specifically advised the parents that failure to provide a safe environment within a reasonable time could result in restriction or termination of their parental duties and rights or the children not being returned to them. Each order directed each parent to perform specific acts. The mother testified that they knew they had to comply with the orders to obtain the return of the children. But both the mother and the father admitted that they had consciously decided not to comply with many of the requirements imposed by the orders.
There are some provisions of the orders with which the parents partially complied and others for which they offered an excuse for their noncompliance. But even *278 giving full credit to their excuses and partial compliance, there were a number of material provisions of the orders with which the parents completely and undisputably failed to comply. Among other things, each of the four orders required the parents to (1) pay $100.00 per month in child support for the children while they were in DPRS custody;[75] (2) obtain an individual psychiatric evaluation;[76] (3) participate and make progress in parenting classes; (4) voluntarily submit to random urinalysis testing; and (5) participate and make progress in anger control classes. While the four orders were in effect, the parents never paid a single dollar of child support even though they admitted they were capable of doing so; never attended a single anger control class; and never attended a single parenting class.
Similarly, at the time of trial, the parents had yet to obtain an individual psychiatric evaluation. At one point, the mother scheduled a psychiatric evaluation and went to the appointment but refused to participate without her husband being present during the examination. Shortly before trial, the parents made appointments to obtain evaluations during the week after the scheduled trial. But, again, even giving full credit to their last minute efforts to comply, it is undisputed that they were not in compliance at the time of trial and had not complied with that portion of the trial court's orders.
With regard to the urinalysis requirement, the DPRS made no requests for urinalysis under the second order, but the parents admitted and other evidence shows that they refused requests to submit to urinalysis during the time the first order was in effect. And, although they took one requested urinalysis test under the third order, they took only two of the six urinalysis tests requested under the December 15, 1998 order, which were requested in the few weeks before trial.
As noted above, the orders set forth requirements with which the parents partially complied. Prior to April 1998, the mother attended six of thirteen scheduled individual counseling sessions, and the father attended five of eleven. But because the parents missed so many appointments, the therapist expelled them from the program. The orders required the parents to maintain appropriate housing free from abuse, neglect, and safety hazards. As discussed above in section II.C., family violence in the home continued after the removal of the children. And, in June 1998, the parents were evicted from the Texas State Technical College campus. In August or September 1998, about five or six months before trial, the parents moved to Austin. There is some evidence that they had a clean, safe home there. But these sporadic incidents of partial compliance do not alter the undisputed fact that the parents violated many material provisions of the trial court's orders.
The evidence establishes as a matter of law that the parents failed to comply with the court's orders specifying the actions the parents had to take for the DPRS to return the children to the parents. The record also conclusively establishes that *279 the children were removed from their parents under Chapter 262 of the Family Code, and it is undisputed that they were in the DPRS's custody for more than nine months after their removal. Accordingly, the parental conduct described in subsection 161.001(1)(O) of the Family Code was established as a matter of law. Any error in failing to submit a specific instruction on juror agreement regarding parental conduct was thus harmless.

IV
The parents additionally contend that their counsel's failure to object to error in the charge and other alleged mistakes during trial rendered his assistance ineffective and that they are entitled to a new trial on that basis. The parents argue that the Sixth Amendment to the United States Constitution entitles a parent to effective assistance of counsel when termination of parental rights is sought. They assert that termination is no less a punishment than imprisonment or even capital punishment.
Several Texas courts of appeals have considered whether the Sixth Amendment or other federal constitutional provisions mandate effective assistance of counsel in termination cases, and they have reached differing conclusions. A number of courts of appeals have concluded that the federal constitution does not grant that right.[77] At least one court of appeals has indicated that it does,[78] although other statements in its opinion indicate that it concluded that the right flows from section 107.013 of the Texas Family Code that requires appointment of counsel in limited circumstances.[79] Another court of appeals has recognized a right to effective counsel because of both section 107.013 and that court's "procedural due process concerns."[80] At least four decisions in other states recognize a right to effective assistance of counsel in termination cases, two of those basing the right on a statute requiring appointment of counsel, one finding that the right emanates from the due process clause of the Fourteenth Amendment, and the fourth apparently basing its conclusion on the Sixth Amendment.[81]
*280 We believe that it is prudent to defer the resolution of whether a parent in a termination case may seek a new trial based on ineffective assistance of counsel because in this case, even applying the stringent test set forth by the United States Supreme Court for use in criminal cases, assistance of counsel was not ineffective.
In Strickland v. Washington, the United States Supreme Court examined at length the considerations in determining whether counsel in a capital or other criminal case was ineffective.[82] The Supreme Court's observations were extensive. The Supreme Court said at the outset of Strickland that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[83] The Court then said there were two components in a criminal case in determining whether assistance of counsel was so defective to require reversal:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[84]
With regard to the first component, the Supreme Court said:
 "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."[85]
 "The purpose [of the Sixth Amendment's effective assistance of counsel guarantee] is simply to ensure that criminal defendants receive a fair trial."[86]
 "Judicial scrutiny of counsel's performance must be highly deferential."[87]
 "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[88]
 "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered *281 sound trial strategy.'"[89]
 "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."[90]
 "The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[91]
The Supreme Court then said with regard to the second component that even if an error by counsel were professionally unreasonable, that "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[92] Elaborating, the Court said:
 "Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice."[93]
 "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."[94]
 "On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."[95]
 "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[96]
 "A court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law."[97]
 "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[98]
 "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."[99]
We reiterate that we leave open the question of whether a claim of ineffective assistance of counsel may be asserted as a basis for reversing a judgment in a parental termination case. Even were we to recognize such a claim, the question of whether our harmless error rule must be discarded in such cases is another significant question that would have to be broached.
But even measuring the parents' complaints about their counsel against *282 Strickland's standards, assistance of counsel was not ineffective in this case. Although the parents' complaints about their counsel are numerous, they are not well-founded. First, the parents cite the failure of their counsel to object to the omission of the children's best interest in material parts of the charge to the jury. Had there been an objection, then no finding would be deemed under Rule 279.[100] However, in light of the entire record, the parents have not "overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'"[101]
Counsel for the parents demonstrated in voir dire of the jury that he knew that the parents' rights could not be terminated, regardless of whether the conduct of the parents would otherwise permit termination, unless termination was found by the jury to be in the best interest of the children. He stated:
Now, folks, everyone keeps talking about we are here for a termination of parental rights. Not necessarily true. If the jury votes and says, "We believe that termination of parental rights is in the best interest of the children," then parental rights are terminated, and no longer will these people ever have the opportunity to be parents with their children. If the jury says, "No, it is not in the best interest of these children to have parental rights terminated," that doesn't say that the kidsthat my folks go out this afternoon and pick up the kids and go home. What that would say is we all keep working together to try to resolve the situation. Okay? So this isn't like a criminal case where it's guilty or not guilty and you can never be tried again because I've been found innocent. This isn't like a car wreck where my client gets up and says, "We either recover the money or we don't recover the money." In this case it is not that kind of finality. In this case the jury can say, "Wait a minute. I don't believe that these folks had a fair chance to do it," and all you've got to do is say, "No, it's not in the children's best interest to terminate parental rights," and what that says is, "Children's Protective Services, you've got to work with them. We all have to work together." Okay? If you say, "Yes, termination is in the best interest," that's it, it's over. Okay?
Then again, in his opening statement, counsel for the parents stated to the jury:
We're here because the State of Texas is asking this jury to rubber stamp what they did and say, "Looks good to us. Take the kids." We're here because we're saying, ladies and gentlemen, this jury needs to come back and say, "No, it's not in those children's best interest. Do not terminate parental rights," and what that will say, what that will do is then the State of Texas will have to honestly work with [the parents], and that's what we're asking. Thank you.
Subsequently, during the objections to the charge, counsel for the parents demonstrated his ability to compare the language of the charge to the verbatim requirements of the Family Code. Counsel objected to the definition of "clear and convincing evidence" in the charge because it omitted three words that the statutory definition contained. Counsel then affirmatively stated to the court that he had no further objections to the charge. Notably, when it came time for closing arguments, counsel for the parents said nothing about the best interest of the children.
*283 Based on this record, the parents did not overcome the presumption that their counsel's decision regarding the charge error was based on strategy. There is precedent in criminal cases for raising jury charge error for the first time on appeal.[102] There is also precedent for raising some types of charge error for the first time on appeal in juvenile cases.[103] Counsel may have made the strategic decision not to object and to attempt to raise charge error for the first time on appeal in the event the jury returned an adverse verdict. The diligence exhibited by counsel in other aspects of the trial and what appear to be other tactical decisions, as discussed below, also indicate that counsel for the parents may well have made a strategic decision not to object to the omission of the children's best interest in material aspects of the charge.
The parents contend that their counsel's failure to object to the broad-form submission of the termination issues also constituted ineffective assistance of counsel. In light of this Court's decision in Texas Department of Human Services v. E.B.,[104] which specifically approved broad-form submission in a termination case, it cannot be said that counsel's failure to object was, "in light of all the circumstances,... outside the wide range of professionally competent assistance."[105] While it would certainly have been within the bounds of professional competency to raise an issue in the trial court so that counsel could ultimately implore this Court to reconsider E.B., it is not outside the bounds of competency to follow a decision of this Court.
The parents also contend that counsel's failure to request an instruction not to consider the parents' religious beliefs constituted ineffective assistance of counsel. There was considerable testimony during the trial about the parents' religious beliefs. At one juncture, the father testified that his conduct toward his children should be judged by God, not by a court. At another, the father testified that it was God who made cocaine available to the parents. Instead of requesting a jury instruction, counsel for the parents cross-examined the DPRS witnesses about the relevancy of the parents' religious beliefs and made arguments to the jury that the parents' religious beliefs were irrelevant to the termination inquiry. Even were it assumed that the trial court should have given an instruction to the jury had counsel so requested, it cannot be said that counsel's decision to address the parents' religious beliefs through argument was anything other than a reasonable exercise of trial strategy.
The parents contend that their counsel should have objected to questions *284 they were asked during trial about their sexual conduct with third parties and alleged "sexual deviations." However, their counsel did object, many times, to questions of this nature. The fact that he did not object to each and every question is again within the realm of reasonable trial strategy in light of the record in this case.
At trial, the DPRS called expert witnesses with backgrounds in psychology and social work. The parents contend that their counsel provided ineffective assistance because he did not challenge the reliability of all psychological expert testimony on the ground that there is no scientific basis for predicting future behavior or evaluating individuals. Counsel for the parents did object to the qualifications of one witness, but not to the scientific reliability of this testimony in particular or the underpinnings of psychology in general. Psychological experts routinely testify in parental termination cases. It was not unreasonable for counsel to fail to take on the reliability of all psychological testimony in this case. More importantly, there is no basis in this record for concluding that had the trial court conducted a hearing on reliability, the evidence would have been shown to be unreliable.
The parents argue that their counsel treated the Family Service Plans developed by CPS as a court order. However, the record reflects that only one Family Service Plan was referenced by a court order in setting forth the tasks that the parents were to perform, and that plan was filed with the court. The other three orders that were in evidence and at issue at trial contained directives to the parents in the orders themselves, wholly apart from any Family Service Plan.
The parents did not receive ineffective assistance of counsel.

V
None of the remaining issues raised by the parents require reversal. The parents asserted in their motion for new trial and in the court of appeals that there was factually insufficient evidence to support any finding by the jury that either parent had endangered the children. Because the evidence conclusively established other parental conduct described in section 161.001(1) of the Family Code, and there is an express or implied finding by the trial court, supported by clear and convincing evidence, that termination is in the children's best interest, it is immaterial whether an alternate submission regarding parental conduct was supported by factually sufficient evidence.
The parents equate parental termination for failure to comply with the court's orders to criminal contempt. They first argue that criminal contempt requires proof beyond a reasonable doubt. As discussed above, the United States Supreme Court held in Santosky that the federal constitution requires a clear and convincing evidence standard of proof in parental termination cases, but not proof beyond a reasonable doubt.[106]
The parents' second contention is that they have been punished with termination of their rights for failing to comply with the trial court's orders delineating what they must do to have their children returned. This punishment amounts to contempt, they argue, and violates the statutory limits on punishment of contempt to six months in jail or a $500 fine. The Legislature has specifically provided in subsection 161.001(1)(O) that failure to comply with court orders like those issued in this case is grounds for termination. That statute, not the contempt statutes, controls.
*285 The parents contend that the trial court erred in admitting evidence that either the father or the mother brought other men home to have sexual relations with the mother while the father watched. Evidence of other alleged sexual activities was also admitted. However, there was unchallenged testimony from an expert witness that the father "endorse[d]" many of the of items on the Minnesota Multiphasic Personality Inventory test that relate to sexual deviance. This expert concluded, without objection, that the father's responses to this standardized test raised concerns about his parenting potential. It cannot be said, based on the record as a whole, that the trial court abused its discretion in admitting the challenged evidence.
Finally, the parents contend that one witness, Jasmine Khan, gave an expert opinion when she was not qualified to do so. Counsel for the parents objected on this basis. But even if this witness's qualifications were not demonstrated, her testimony was cumulative of other witnesses.
In sum, any errors committed by the trial court did not require reversal.

* * * *
For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment terminating the parent-child relationships between each of the children, J.F.C., A.B.C., and M.B.C., and their mother and father.
Justice O'NEILL concurred in the judgment only.
Justice HANKINSON filed a dissenting opinion, in which Justice ENOCH joined.
Justice SCHNEIDER filed a dissenting opinion.
Justice HANKINSON dissenting, joined by Justice ENOCH.
The Court states the issue in this case as "whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children." This statement of the issue will come as a surprise to the parties and the court of appeals, as no one has raised, briefed, or addressed this issue at any stage of these proceedings. In this parental-rights-termination case the State asked us to decide whether due process requires a court of appeals to review alleged errors in the charge when the parents did not object to those errors at trial. Instead of answering that question, the Court explains the consequences of the parents' failure to object to the first alleged charge error (omission of a statutory element required for termination) under Texas Rule of Civil Procedure 279. But those consequences are not at issue, and rule 279 does not answer the actual question presented of whether, in light of the constitutional interests at stake, our law requires an appellate court to consider the parents' complaints as if they did object to the charge, even though they admit they did not. The Court does not even attempt to explain how it can review the parents' second unpreserved claim of charge error (concerning broad-form submission), instead simply concluding that the error, if any, was harmless. Refusing to answer the question presented does a disservice to our courts of appeals by failing to resolve the conflict among them as to whether they may review unpreserved error in termination cases; a disservice to our established jurisprudence, which permits us to review only preserved complaints unless a recognized exception exists; and most importantly, a disservice to the parents and children who are entitled to consistent and efficient appellate review that fairly adjudicates their *286 complaints in these time-sensitive and compelling cases.
I therefore dissent and write separately to explain how I would resolve the actual issue presented in this case. Because I conclude that Texas' common-law doctrine of fundamental error permits us to review the alleged charge errors, I would hold that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process. Having considered the alleged errors, however, I disagree with the court of appeals that the omission in the jury charge was harmful, and I would therefore remand this cause to the court of appeals for it to consider the remaining issues it did not yet address.
The Court relies on rule 279 to affirm the trial court's termination judgment. But rule 279 does not tell us whether charge error in a parental-rights-termination case can be reviewed for the first time on appeal. The purpose of rule 279 is to "salvage" a trial court's judgment when a party failed to object to an omitted element of a ground of recovery in a jury charge. See 4 McDonald & Carlson, Texas Civil Practice § 22:58, at 500-01 (2d ed.2001). Under rule 279, the court may deem the finding in support of the judgment if there is "some evidence" to support the finding. See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990); Cielo Dorado Dev., Inc. v. Certainteed Corp., 744 S.W.2d 10, 11 (Tex.1988). By marshaling the evidence to support a deemed finding against the parents under rule 279, the Court essentially conducts a harmful-error analysis of the charge error. But this approach is circular. The Court determines that applying rule 279 to deem a finding in support of the judgment does not violate due process because it concludes there was no harmful error. But had the error been harmful, the Court could not apply rule 279, and the parents would be left where they started: asking an appellate court to review unpreserved charge error. The Court should address the issue raised in the petition that we granted, and decide whether our law on preservation of error mandates appellate review of the parents' unpreserved complaints.
The Court's opinion describes how the jury charge in this case failed to track the statutorily required language found in Texas Family Code § 161.001. On appeal, the Coxes argued that the jury charge was erroneous because: (1) it failed to instruct the jury that they must find termination to be in the best interest of the children; and (2) the broad-form questions and disjunctive instructions violated their due process rights under the Fourteenth Amendment of the United States Constitution and Article 1, Sections 3 and 10 of the Texas Constitution. The Coxes acknowledged that they had not preserved these complaints in the trial court. However, they argued that the constitutional dimension of the liberty interests at stake and the quasi-criminal nature of a parental-rights-termination action warranted appellate review of the alleged jury-charge errors.
The court of appeals agreed. Specifically, the court of appeals held that Fourteenth Amendment procedural due process requires review of "core issues" in the jury charge in an involuntary parental-rights-termination case. 57 S.W.3d at 72. The court defined those "core issues" as "(1) the predicate grounds for termination, and (2) whether termination is in the best interest of the child." Id. at 72 n. 5. After reviewing the jury charge in this case, the court concluded that the use of the broad-form question and disjunctive instruction in the jury charge was proper, having been explicitly approved by this Court in Texas Department of Human Services v. E.B., *287 802 S.W.2d 647 (Tex.1990). 57 S.W.3d at 73. The court also concluded, however, that the omission of the "best interest" instruction as to Tawnya and the placement of the "best interest" instruction as to Paige constituted harmful error, because of the "potential" that the jury could have terminated both parents' rights "without finding that termination was in the best interest of the children." Id. at 74, 75. The court remanded the case to the trial court for a new trial without reviewing the Coxes' other complaints on appeal. Id. at 75. In its petition for review, the Department contends that the court of appeals erred by reviewing the unpreserved jury-charge error.
In effect, the court of appeals held that our state procedural rules violate due process in parental-rights-termination cases because they prohibit review when error is not preserved in the context of "core issues." See id. at 72-73. The analytical starting point for determining whether our procedures violate the Constitution is our law on error preservation for appellate review. As a general rule, no error may be reviewed on appeal that was not raised before the trial court. Tex.R.App. P. 33.1. Nevertheless, like most other jurisdictions, our civil jurisprudence is well settled that appellate courts may consider unpreserved error that is "fundamental." See McCauley v. Consol. Underwriters, 157 Tex. 475, 304 S.W.2d 265, 266 (1957); Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979, 982 (1947); see also 6 McDonald & Carlson, Texas Civil Practice § 47:4, at 1201-02 (2d ed.1998) (recognizing fundamental error as an exception to the general rule of preservation); W. James Kronzer, Laying the Foundation for Appellate Review, in Appellate Procedure in Texas (State Bar of Texas, 2d ed.1979), § 9.2, at 204-06 (same); Allen Wood, The Bill of Exceptions as Basis for Review, in id. § 11.5, at 248-49 (same). While most jurisdictions recognize some type of fundamental error, they do not define it uniformly.[1] Black's *288 Law Dictionary defines the essence of fundamental error as that which is "so obvious and prejudicial that an appellate court should address it despite the parties' failure to raise a proper objection." Black's Law Dictionary 563 (7th ed.1999) (defining also "plain error" and "error apparent of record"). Our own application of fundamental error review has changed throughout the years. Consequently, an analysis of its evolution in our jurisprudence is useful to understanding how and when we should apply it.
We first recognized fundamental error as a principle firmly rooted in the common law. In Jones v. Black, 1 Tex. 527 (1846), this Court observed that as a general rule, "the record being silent as to any judicial action either sought or had upon the issues of law, they will be considered as waived, and will not be made the subject of revision here." Id. at 529. Nevertheless, this Court held that "`if the foundation of the action has manifestly failed, we can not, without shocking the common sense of justice, allow a recovery to stand.'" Id. at 530 (quoting Palmer v. Lorillard, 16 Johnson 343, [348], 1819 WL 1790 (N.Y. 1819)); see also Siese v. Malsch, 54 Tex. 355, 357 (1881) (objections that go to merits and foundation of action will be considered though unassigned as error); Rankert v. *289 Clow, 16 Tex. 9, 13 (1856) (same); Salinas v. Wright, 11 Tex. 572, 577 (1854) (same); Wetmore v. Woodhouse, 10 Tex. 33, 34 (1853) (same).
Although these early cases considered fundamental error to be a principle of common law, our Legislature had already codified its own version of fundamental-error review. In 1846, the Legislature enacted a statute that provided for supreme court review of "error in law either assigned or apparent on the face of the record." Act approved May 12, 1846, 1st Leg., § 24, 1846 Tex. Gen. Laws 249, 256-57, reprinted in 2 H.P.N. Gammel. The Laws of Texas 1838-1846, at 1555, 1562-63 (Austin, Gammel Book Co. 1898). But in 1850, the Legislature enacted a statute providing that "[t]he appellant or plaintiff in error, shall in all cases file with the clerk of the court below, an assignment of errors, distinctly specifying the grounds on which he relies ... and all errors not so distinctly specified, shall be considered by the Supreme Court as waived." Act approved Feb. 11, 1850, 3rd Leg., R.S., ch. 139, § 9, 1850 Tex. Gen. Laws 171, 173-74, reprinted in 3 Gammel, Laws of Texas 1847-1854, at 609, 611-12 (1898). Both statutes were made applicable to the courts of civil appeals when those courts were organized. See Act approved Apr. 13, 1892, 22nd Leg., 1st C.S., ch. 15, §§ 24, 25, 1892 Tex. Gen. Laws 25, 29, reprinted in 10 Gammel, Laws of Texas 1891-1897, at 389, 393 (1898). Although by its terms, the 1850 statute appeared to repeal the 1846 statute, our courts continued to consider fundamental error without acknowledging any effect of the 1850 statute. See Ramsey, 205 S.W.2d at 982. But see Oar v. Davis, 105 Tex. 479, 151 S.W. 794, 796 (1912) (holding that the statutes could be harmonized).
In one of the first cases to construe the 1846 statute, Wilson v. Johnson, 94 Tex. 272, 60 S.W. 242 (1900), this Court stated that "it is difficult to tell what is meant by this language; but we incline to think it intended to signify a prominent error, either fundamental in character, or one determining a question upon which the very right of the case depends." Id. at 243; see also Houston Oil Co. of Tex. v. Kimball, 103 Tex. 94, 122 S.W. 533, 537 (1909) ("Perhaps the best expression is that it must be a fundamental error, such error as being readily seen lies at the base and foundation of the proceeding and affects the judgment necessarily."). Thus, "`fundamental error' is not a statutory term, but is one coined by the courts in interpreting our [statutes]." Texas & Pac. Ry. Co. v. Lilly, 118 Tex. 644, 23 S.W.2d 697, 698 (1930).
Our decisions from the pre-rules era disclose two policies that informed the application of fundamental-error review. First, as a matter of efficiency and economy, appellate courts were not required to examine the record in order to ascertain whether there was a basis for claiming error. See Wilson, 60 S.W. at 243 ("The purpose of assignments of error is to point out the errors complained of, and not to leave the appellate court to grope through the record to ascertain whether error has been committed or not."); see also Ford & Damon v. Flewellen, 276 S.W. 903, 903-04 (Tex.Com.App.1925, judgm't adopted) ("Any other rule ... would place an almost unbearable burden upon our appellate courts."). Thus, appellate courts considered unpreserved error only when the complaint could be seen on the face of the "record"defined as "those proceedings which lie at the foundation of the court's power to render the judgment," such as the pleadings, the charge, the verdict, and the judgment itself. Texas & Pac. Ry. Co., 23 S.W.2d at 699; see Yardley v. Houston Oil Co. of Tex., 288 S.W. 861, 868 (Tex.Civ.App.-Beaumont 1926, writ dism'd) ("[I]n considering fundamental error, the *290 Court of Civil Appeals can only read the pleadings of the parties, the charge of the court, the verdict of the jury, and the judgment of the court...."). If determining whether there was error required examining the statement of facts, the courts would not consider it "fundamental." See, e.g., Yardley, 288 S.W. at 868 (trial court's allegedly erroneous construction of deed was not "fundamental" because it would require reviewing the evidence). Second, appellate courts only reviewed unpreserved error when there was "a good and sufficient ground for the court to interfere to prevent injustice being done to one of the parties." Houston Oil Co., 122 S.W. at 537; see also Hollingsworth v. Holshousen, 17 Tex. 41, 47-48 (1856) (citing the court's practice to review an erroneous jury charge when there is reason to believe it influenced the verdict to the prejudice of a party); Jones, 1 Tex. at 530 (rejecting a challenge to improper venue as merely a "dilatory" challenge and not a foundational objection).
In 1941, both statutes were repealed by the act vesting the Supreme Court with rulemaking authority. Tex.Rev.Civ. Stat. Ann. art. 1731a, §§ 1, 2 (Vernon 1948); see City of Santa Anna v. Leach, 173 S.W.2d 193, 197-98 (Tex.Civ.App.-Eastland 1943, writ ref'd w.o.m.). We effectively "re-enacted" the 1850 statute in the form of Texas Rule of Civil Procedure 374, which required that any errors had to be presented in the court below or would be waived. For the few years immediately following the promulgation of the 1941 rules, a few courts of civil appeals held that they could no longer review fundamental error. See Brown v. O'Meara, 193 S.W.2d 715, 721 (Tex.Civ.App.-Galveston 1946, writ ref'd n.r.e.); Leach, 173 S.W.2d at 198.
In Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979, 980 (Tex.1947), however, we held that the courts of civil appeals retained the authority to consider fundamental error, notwithstanding the apparent repeal of the statute and the enactment of rule 374. Ramsey involved an election for county commissioner. The candidate who received the fewest number of votes sued the winner on the grounds that the winner was not a resident of the precinct and therefore ineligible to hold office. The parties agreed that the only issues before the trial court were their respective residencies, the location of the precinct lines, and the validity of an order changing those precinct lines. The court of civil appeals, however, reversed the judgment on the ground that Texas Revised Civil Statute article 3032 permitted only the candidate who received the greatest number of votes cast to receive the certificate of election. See id. at 980-81. That issue was neither preserved in the trial court nor assigned as error in the briefs. See id. at 980.
The court of appeals certified to this Court the question of whether it erred in determining a cause on a point not assigned as error. See id. We held that the court of appeals did not err, because fundamental-error review applied. Id. at 983-84. Citing eighty-nine years of Texas courts reviewing fundamental error, even "in the face of a statute which declared that all [unpreserved] errors ... should be considered as waived," this Court asked, "must we now hold that our courts of civil appeals have no authority to consider such errors because Art. 1837 has again been repealed by the substantial reenactment of Art. 1844 in the form of Rule 374, T.R.C.P.? As to errors that are truly fundamental, we think the answer must be No." Id. at 982-83.
While recognizing that fundamental-error review survived the promulgation of the Rules of Civil Procedure, we acknowledged that the doctrine could not be the *291 same as the one codified in the 1846 statute. Declining to create an "all-inclusive" definition of the term, we held that, for purposes of the Ramsey election dispute, "an error which directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state, is a fundamental error." Id. at 983. We further determined that the alleged trial error would adversely affect the "fundamental public policy" found in the Texas Constitution and statutes that no one can be declared elected to public office unless he or she receives a majority or plurality of legal votes cast. Id.
Ten years later, in McCauley v. Consolidated Underwriters, 157 Tex. 475, 304 S.W.2d 265, 266 (Tex.1957), we reaffirmed the survival of the fundamental-error review doctrine, and held that it also applied in our Court. In McCauley, the trial court had set aside and vacated a default judgment. The court of civil appeals affirmed the order, despite the fact that it was a nonappealable interlocutory order. McCauley v. Consolidated Underwriters, 301 S.W.2d 181, 185 (Tex.Civ.App.-Beaumont 1957), rev'd, 157 Tex. 475, 304 S.W.2d 265 (Tex.1957). In its response to the plaintiff's writ of error to this Court, the defendant did not raise the jurisdictional defect in the court of appeals. Nevertheless, we held that fundamental error applied, reaffirming the definition from Ramsey. 304 S.W.2d at 265. We expanded on the definition, holding that "[w]hen the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter, the error will also be regarded as fundamental." Id. at 266. Accordingly, we held that this Court had the power to reverse the court of appeals' judgment, and we dismissed the appeal on the unassigned jurisdictional error. Id.
Ramsey and McCauley were watershed decisions, establishing that fundamental-error review is not barred by our procedural rules. In the forty years since those decisions, Texas courts have consistently recognized and reaffirmed the existence of the fundamental-error doctrine. Because there is no statute defining the principle, we tend to agree with the commentator who noted that "[t]here is no single satisfactory definition of the phrase, nor can one easily analyze the cases for prognostic purposes." Kronzer, supra, § 9.2, at 205. In reviewing our caselaw, however, we are able to distill two types of error that our courts have consistently recognized are subject to fundamental-error review.
First, and most commonly, we apply fundamental-error review when a jurisdictional defect exists in the case. See, e.g., Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 445-46 (Tex.1993) (holding that standing is a jurisdictional issue that can be raised for the first time on appeal); New York Underwriters Ins. Co. v. Sanchez, 799 S.W.2d 677, 678 (Tex. 1990) (holding that lack of appellate jurisdiction is fundamental error); McCauley, 304 S.W.2d at 265-66 (applying fundamental-error review because intermediate court lacked jurisdiction). With "jurisdictional-based" fundamental-error review, an appellate court may reverse the judgment of the court below for errorwithout conducting a review for harmeven if the error is not preserved. See Baker v. Hansen, 679 S.W.2d 480, 481 (Tex.1984).
Second, we apply fundamental-error review when an important public interest or public policy is at stake. See, e.g., Ramsey, 205 S.W.2d at 983. "Public-interest-based" fundamental error differs from jurisdiction-based fundamental error in both a procedural and substantive way: As a procedural matter, public-interest-based fundamental-error review does not mandate *292 automatic reversal. Instead, after an appellate court determines that it will consider the unpreserved error, the court conducts the next two steps of appellate review and determines whether an error in fact occurred, and whether the error is harmful. See W. Wendell Hall, Standards of Review in Civil Appeals, 24 St. Mary's L.J. 1045, 1056 (1993); see, e.g., In re C.O.S., 988 S.W.2d 760, 767 (Tex.1999) (concluding that failure to give statutory admonishments, while fundamental error, was not harmful error requiring reversal); State v. Santana, 444 S.W.2d 614, 615 (Tex.1969) (holding that jury charge in juvenile case warranted fundamental-error review and analyzing whether charge violated due process), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594, on remand, 457 S.W.2d 275 (Tex.1970).
Substantively, public-interest-based fundamental error is rare, implicated only when our most significant state public interests are at stake. The meaning of the "public interest" that is adversely affected must be extremely circumscribed, or the exception would swallow the rule. Thus, it cannot be enough to allege that an error violates a party's constitutional rights. See Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001) (holding that constitutional claim that paternity suit should not be barred by statute of limitations is waived by failing to raise the issue before the trial court) (citing Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex.1993)). In Ramsey, we characterized the type of public interest that must be at stake as one "declared in the statutes or Constitution of this state." Ramsey, 205 S.W.2d at 983. However, we carefully declined to create an "all-inclusive" definition of a public interest that requires fundamental-error review. Id. Subsequent cases have identified statements of public interest based on our constitution and reflected in our caselaw. See, e.g., Santana, 444 S.W.2d at 615 (citing "the constitutional importance of this case to the public generally"); Woodard v. Texas Dep't of Human Res., 573 S.W.2d 596, 597 (Tex.Civ.App.-Amarillo 1978, writ rev'd n.r.e.) (citing Texas Supreme Court precedent for the proposition "that the interest of the public is affected when the custody of a child is at issue").
Since Ramsey, our courts have categorically recognized only one other type of public interest so significant that fundamental-error review appliesthe state's interest in the rights and welfare of minors. In particular, our courts have recognized fundamental-error review in the following cases: the failure to give statutory admonishments in a juvenile delinquency proceeding, see In re C.O.S., 988 S.W.2d at 767; a jury charge submitting "preponderance of the evidence" as the burden of proof in a juvenile delinquency case, see Santana, 444 S.W.2d at 615; a jury charge based on an invalid theory of liability in a juvenile delinquency case, see R.A.M. v. State, 599 S.W.2d 841, 846 (Tex.Civ.App.-San Antonio 1980, no writ); the submission of "preponderance of the evidence" as the burden of proof in a parental-rights-termination case, see Woodard, 573 S.W.2d at 597; and an omission in a jury charge in a divorce case that deprived a minor child of the right to support, see Rey v. Rey, 487 S.W.2d 245, 248 (Tex.Civ.App.-El Paso 1972, no writ).
But not all cases involving children trigger fundamental-error review. In one case involving a minor, we rejected fundamental-error review because the error affected only the immediate private litigants and did not impact a matter of more general public concern. See Newman v. King, 433 S.W.2d 420, 422 (Tex.1968) (failure to appoint a guardian ad litem for a minor plaintiff in a change-of-name proceeding *293 action does not warrant fundamental-error review because only the rights of the particular minor and litigants are affected). Our courts of appeals have reached the same result in other cases. See Wristen v. Kosel, 742 S.W.2d 868, 870-71 (Tex.App.-Eastland 1987, writ denied) (no fundamental-error review in a custody case between two fit parents in which "[n]either parent's parental rights have been terminated"); Ingram v. Ingram, 249 S.W.2d 86, 88 (Tex. Civ.App.-Galveston 1952, no writ) (no fundamental-error review in a divorce case in which "the result of the suit can be of consequence to the litigants involved alone and ... no broad question of public interest is involved").
Having reviewed our case law in this area, we are left with two guiding principles for determining whether fundamental-error review should apply to a matter of public interest: (1) the error complained of must implicate a significant public interest or policy of the state, articulated by our statutes, constitution, or caselaw; and (2) the nature of the error must be such that it impacts a truly general public interest, and not solely that of private litigants. To guide our determination in difficult cases, we should apply fundamental-error review to further its underlying policy of promoting judicial economy while avoiding manifest injustice.
With these principles in mind, I would turn to the errors alleged in this case to determine whether the fundamental-error doctrine applies. First, the Coxes allege that the trial court erroneously failed to instruct the jury that it must find termination of the Coxes' rights to be in the best interest of the child. The Coxes admit that they did not object at trial to the errors that they raised on appeal. Because charge error does not implicate the essential jurisdiction of the trial court to act, we should not review the error unless we determine that the public-interest basis for fundamental-error review applies. Applying the principles identified above, I would conclude that this charge error warrants fundamental-error review.
Our first inquiry should be whether the error affects a significant public interest, articulated in our statutes, constitution, or caselaw. See Ramsey, 205 S.W.2d at 983. In the statute governing suits affecting the parent-child relationship, our Legislature has declared that "[t]he public policy of this state is to ... assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child." Tex. Fam.Code § 153.001(a). The statute further provides that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Id. § 153.002. And in the Family Code subchapter governing the termination of parent-child relationships, the Legislature has emphasized repeatedly that the "best interest of the child" is the state's foremost priority in determining the welfare of children. See Tex. Fam.Code §§ 161.001(2) (court must find by clear and convincing evidence that termination is in the best interest of the child), .003(a)(5) (court may order termination based on inability to care for a child if it is in the child's best interest),.004(a)(4) (court may order termination based on a subsequent petition if it is in the child's best interest), .005(a) (court may order termination when parent is petitioner if in the best interest of the child),.007(3) (court may order termination if pregnancy results from parent's criminal act and if in the best interest of the child),.204 (court may order termination based on affidavit of waiver of interest if it is in the best interest of the child); see also §§ 107.001(b) (court must appoint guardian ad litem to represent best interest of *294 the child in a termination suit brought by the government); 153.433 (court shall order access to a grandchild by a grandparent if in the best interest of the child). Here, the charge omits the instruction that the jury must consider the "best interest of the children." Thus, the charge directly affects a statutorily defined public interest.
Further, the charge error directly affects the public policies stated in our caselaw. We presume as a matter of public policy that the best interest of a child is usually served by maintaining the parent-child relationship. See In re G.M., 596 S.W.2d 846, 847 (Tex.1980); Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). Here, the State's effort to involuntarily terminate the Coxes' rights affects the public interest in maintaining the parent-child relationship. In addition, we employ a higher standard of proof in parental-termination cases than we do in ordinary civil cases, reflecting the particular importance of ensuring a correct judgment in these cases. In re G.M., 596 S.W.2d at 847 (citing Addington v. State, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)); see also Tex. Fam.Code § 161.001 (codifying In re G.M. by establishing "clear and convincing evidence" as the burden of proof). In this case, the charge omits a required finding for termination and therefore directly and adversely impacts the public interest in reaching a correct judgment.
Having determined that the error alleged here affects a significant public interest, we should look to see whether the error impacts the public generally, and not just the immediate litigants. See Newman, 433 S.W.2d at 422. I would hold that an involuntary termination suit impacts the public generally. Parents have primary responsibility for the "`custody, care and nurture'" of their children. In re G.M., 596 S.W.2d at 846 (quoting Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). The State has a right and duty to look after the welfare of the children within its borders. See Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876, 878 (1948). Consequently, when the State acts to terminate a parent's rights, the State assumes the responsibility for the children's welfare. The State's responsibility for the support of children is "obviously a matter of public interest" that "transcends the interest of the parties" to the immediate action. Rey, 487 S.W.2d at 248; cf. Wristen, 742 S.W.2d at 870-71 (public interest not affected by the issue of which parent is appointed as managing conservator when both parents are able to take care of the child). The charge in this case allowed the trial court to terminate Tawnya Cox's and Paige Cox's parental rights without specifically instructing the jury that it must first find termination to be in the best interest of each child. Accordingly, the jury charge in this case had a potentially adverse impact on the Cox children's best interest, which is a matter of public interest in a case that affects the public generally.
Concluding that the jury charge error alleged here is subject to fundamental-error review does not undermine the general policy of judicial economy that underlies our rule for preservation of trial error. In Pirtle v. Gregory, 629 S.W.2d 919 (Tex. 1982), we explained that one rationale for requiring preservation is to avoid surprise to the opponent on appeal. Id. at 920. Here, the State had the burden of proving all the statutory elements of termination. Tex. Fam.Code § 161.001. The State can hardly say that it was "surprised" to find that the jury charge did not contain the elements that the statute clearly requires it to prove. Moreover, if the error likely caused an improper verdict, the State's interest would be furthered by appellate review, because the State's overriding concern *295 is the children's best interest, not the termination of parental rights.
Accordingly, I would hold that our courts may review unpreserved jury-charge error relating to the required statutory findings in a parental-rights-termination case under our common-law doctrine of fundamental-error review. As a result of this holding, I would conclude that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process.
Having determined that the complaint in this case can be reviewed, our appellate procedure next requires that we determine whether the jury charge was error. See Hall, supra, at 1056; see, e.g., In re C.O.S., 988 S.W.2d at 767. Here, the proposed charge did not properly state the essential elements for terminating parental rights. Family Code § 161.001 provides that a court can involuntarily terminate a parent's rights only after the court has found by clear and convincing evidence both that: (1) the parent has committed one or more of the enumerated predicate acts or omissions; and (2) termination is in the best interest of the child. See Tex. Fam.Code § 161.001; see also Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges (Family) PJC 218.1 (2000). As to Tawnya, the proposed charge completely omitted the instruction that the jury find termination to be in the best interest of the child. As to Paige, the proposed charge included the "best interest" instruction only in conjunction with the alternative ground for termination that he had failed to comply with a court-ordered plan. Because a parental-rights-termination lawsuit is founded in statute, the jury charge should track the language of the statute. See Spencer v. Eagle Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994). I therefore agree with the court of appeals that because the "charge fails to require all the findings that, under the Family Code, are necessary to terminate parental rights," the charge was error. 57 S.W.3d at 74.
Having determined that the parents' complaint can be reviewed on appeal, and that the trial court erred, I would review next the court of appeals' determination that the error was harmful. See Hall, supra, at 1056; see, e.g., In re C.O.S., 988 S.W.2d at 767. The court of appeals stated that the jury "could very well" have terminated Tawnya's rights and "may very well" have terminated Paige's rights without finding that termination was in the children's best interest. 57 S.W.3d at 74-75. But whether the jury may have improperly terminated the Coxes' parental rights because the charge omitted a statutory element is relevant only to whether there was error in the first instance. The Coxes must still show that the error probably caused rendition of an improper verdict. See Tex.R.App. P. 44.1(a). The court of appeals summarily stated that the evidence for terminating Tawnya's rights was "not highly persuasive," but it did not discuss that evidence. 57 S.W.3d at 74. And, with respect to Paige, the court of appeals said that the potential for the jury to terminate without finding termination in the children's best interest was increased because there was "less support" in the evidence for the ground that Paige had failed to comply with a court-ordered plan. Id. at 75. But the court of appeals never explained how it reached its conclusion as to either parent that the error probably caused rendition of an improper judgment. We must review the "pleadings of the parties, the evidence presented at trial, and the charge in its entirety" to determine whether the charge in this case probably resulted in an improper judgment. Island Recreational Dev. v. Republic of Tex. Sav. Ass'n, 710 S.W.2d 551, 555 (Tex.1986); see *296 Reinhart v. Young, 906 S.W.2d 471, 473 (Tex.1995).
The Department's evidence overwhelmingly focused on and supported the conclusion that termination was in the best interest of these children. In particular, Tawnya Cox testified that she and her husband used cocaine while the children were at home, and that she believed her children were safe because cocaine made her more aware of her surroundings. The Coxes testified to arguing violently with each other. In one of those arguments, she knocked several teeth out of his mouth, and during another argument, he locked her out of the house while she was naked. Dr. Shinder, a psychologist whose office evaluated the Coxes, opined that neither could be fit parents due to their "aggression and violence and hostility" and drug use. Jasmine Khan, a licensed professional counselor, testified about the Cox children's extreme, abnormal behavior when they were first removed from their parents' household. Most significantly, she described hostile, aggressive, and violent play by A.B.C. Khan also said that A.B.C. told her he witnessed violence and was a victim of violence in the Cox home. Other Child Protective Services workers reiterated this testimony. Khan also testified that after several months in foster care, the children improved tremendously, and did not display any distress being away from their parents. She testified that the Coxes were unwilling and unmotivated to make productive changes to address the issues placing their children at risk. A police officer described numerous times that he had to investigate domestic-disturbance calls at the Cox household, and described the confrontations as "pretty violent" such that he had concern for the children. A conservatorship worker from Child Protective Services testified that she observed visits between the Coxes and their children. She stated that the visits tended to be "chaotic," and the children's behavior deteriorated after each visit with their parents. The conservatorship worker also described the Coxes' hostility and anger toward each other. Notably, the testimony of Dr. Shinder, Khan, the police officer, and the conservatorship worker all culminated with their opinions that termination of the Coxes' parental rights and adoption would be in the Cox children's best interest. And other witnesses who worked on the Cox case, including a Child Protective Services supervisor and Court Appointed Special Advocate, similarly testified that termination would be in the Cox children's best interest.
The Coxes provided little evidence to contradict the evidence discussed above. However, their case likewise focused significantly on evidence relevant to whether termination was in the children's best interest. For example, the Coxes attempted to explain their effortsafter a trial date was set on the Department's termination petitionto comply with the Family Service Plan and to show their ability to provide the children a loving home. A year after the trial court initially ordered compliance with the Family Service Plan, in the fall of 1988, the Coxes moved to Austin from Waco. The jury heard testimony about a letter the Coxes' attorney wrote to Child Protective Services in Austin, stating that the Coxes wanted to "derail the termination" by working with the Department. Also, Paige Cox testified that he called Child Protective Services in Austin once they moved in an effort to start compliance with the Family Service Plan. The Coxes also presented evidence about the changes in their lives and relationship since moving to Austin to demonstrate that termination would not be in the children's best interest. Tawnya testified about her finding work in Austin. She said that Paige had *297 become more open and communicative, and she described the environment in Austin as "wonderful." The Coxes' obstetrician for the birth of their fourth child who is not the subject of this suitdescribed the Coxes as "an appropriate, courteous, and loving couple." And the Coxes' landlord and roommate in Austin testified that their home was a "safe environment." Thus, much of the evidence adduced at trial was probative toward the issue of whether termination was in the children's best interest.
Moreover, the rest of the trial proceedings put this evidence in perspective, centering the jury's attention on the best interest of the children. The Department's pleadings specifically alleged as to each individual parent that "termination of the parent-child relationship [between the parent and each child] is in the best interest of the children, as required by Section 161.001 of the Texas Family Code." The attorneys for all parties repeatedly emphasized throughout the voir dire, examination of the witnesses, opening statements, and closing argument that the jury's focus should be on the children's best interest. (In its opinion, the Court quotes two of the relevant portions of the opening argument and voir dire record in which the Coxes' counsel reiterates that the jury's determination will regard the children's best interest. 96 S.W.3d at 261.) Finally, the jury charge listed factors to be considered in determining the children's best interest, and many of these factors related to the evidence discussed above.
In light of the totality of the circumstances and the consistent and paramount emphasis upon the children's best interest at trial, I would conclude that the failure to submit the "best interest" instruction was not reasonably calculated and did not probably cause the rendition of an improper verdict. See Tex.R.App. 44.1; Reinhart, 906 S.W.2d at 473; Island Recreational Dev., 710 S.W.2d at 555. I would conclude that the court of appeals therefore erred in reversing the trial court's judgment on the basis that the omitted instruction was harmful error.
The Coxes' second complaint is that the submission of the jury charge in a disjunctive instruction and as a broad-form question violated their constitutional rights to due process and due course of law. Using the analytical framework I have set out above, I would first determine whether the alleged error affects a significant public interest, articulated in our statutes, constitution, or caselaw. The Coxes assert that submission of a broad-form question violates due process because it permits the termination of parental rights without first ensuring that ten jurors agree on each statutory termination ground. If the charge violates due process for the reasons that the Coxes state, that violation would adversely impact the public interest in ensuring that the statutory grounds required for termination are found by clear and convincing evidence. See Tex. Fam. Code § 161.001. Furthermore, for the same reasons discussed as to the first charge complaint, this second charge complaint relates directly to the public interest in correct judgments and affects the public generally. Finally, broad-form jury charges are used uniformly in cases like this one, and therefore resolving the issue that this complaint raises would impact many parental-rights-termination cases. Accordingly, I would conclude that our fundamental-error doctrine permits us to review this complaint.
I would hold that the submission of the broad-form question did not violate the Coxes' due process rights, and therefore was not error. In Texas Department of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex.1990), we identified the controlling *298 question in a parental-rights-termination case as whether the parent-child relationship between the parent and the children should be terminated. In the Coxes' case, the charge specifically instructed the jury that at least ten jurors must agree on all answers supporting the verdict. See Tex.R. Civ. P. 292. We presume that the jury understood and followed its instructions. See Gillette Motor Transp. Co. v. Whitfield, 145 Tex. 571, 200 S.W.2d 624, 626 (1947).
The Coxes argue that our holding in Crown Life Insurance Co. v. Casteel, 22 S.W.3d 378 (Tex.2000), alters our analysis in E.B. In Casteel, we held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." Id. at 389. Here, the Coxes do not assert that either of the disjunctive grounds for termination were invalid theories as applied to them. See id. And the Coxes raise no new arguments in this case to give us cause to revisit our decision in E.B. Accordingly, the court of appeals correctly held that the trial court did not abuse its discretion in submitting the broad-form jury charge.
For the reasons expressed above, I respectfully dissent to the Court's opinion and judgment in this cause. The Court belabors the consequences of failing to preserve error, instead of deciding whether we can review that unpreserved error. The Court then inexplicably reviews an unpreserved complaint that it decides is harmless. Not only does the Court reach issues not presented by the parties and that are unnecessary to the resolution of the case, it retreats from our error-preservation standards, thereby adding further uncertainty to the already conflicting decisions from the courts of appeals. The only general proposition I can draw from the Court's opinion is that courts of appeals should review error when they can determine from the record that the error is ultimately harmless. But my greatest concern is that the Court abandons its responsibility to ensure that parents and children receive fair, consistent, and expeditious appellate review in these most difficult cases. Accordingly, I respectfully dissent.
Justice SCHNEIDER, dissenting.
Under the Texas and United States Constitutions, the parent-child relationship is considered a fundamental liberty interest deserving due process protection. Indeed, the relationship is so important that no amount of antisocial behavior directed toward a child or in defiance of a court's order, standing alone, provides enough justification for the State of Texas to terminate the parent-child relationship. Our law requires that, in addition to finding one or more of the legislative-specified laundry list of antisocial conduct by a parent, the fact finder must also find that terminating the parent-child relationship is in the "best interest" of the child.
Today, the Court holds that the "best interest" element can be deemed to support the judgment if, without objection, that element is erroneously omitted from or obfuscated in a jury charge. 96 S.W.3d at 259-260. And, the Court not only deems a best interest finding in this case, but also, to deem the finding, the Court applies a questionable legally sufficient clear and convincing evidence test never requested by the parties or articulated by this Court. Then, the Court holds that the parents' failure to follow the Family Service Plan[1] is conclusively established, so *299 that the net effect is the case is reversed and judgment is rendered without a remand to the court of appeals for the requested factual sufficiency review of the termination grounds. 96 S.W.3d at 260.
I respectfully dissent. The question squarely before the Court is whether procedural due process considerations require an appellate court to review unpreserved jury-charge errors in a parental-rights termination case. I would address that issue directly. And, in doing so, I would hold that Texas and the United States constitutional procedural due process considerations do not mandate appellate review of unpreserved jury-charge error. The Texas Legislature has devised, and our courts have applied, a fair and just procedural framework at the trial and appellate levels for handling parental-termination cases. Consequently, I would hold the parents waived their right to appellate review of the alleged jury-charge errors, because the parents failed to object in the trial court about the errors they raise here.
Finally, although I agree the court of appeals' decision should be reversed, I do not agree that this Court, under our Texas Constitution, can obviate the court of appeals' role. See Tex. Const. art. V, § 6; Tex. Gov't Code § 22.225(a). This Court cannot conclusively determine a factual question, namely, whether the parents complied with the Family Service Plan. Thus, even if I agree the Court's "deemed finding" procedural route is appropriate in this case, I believe the Court should remand this case to the court of appeals for a factual sufficiency review on the termination grounds the parents challenge.

I. BACKGROUND
Depending upon one's view, the jury charge either (a) omitted a best interest instruction as to one of the parents and one of the grounds for the other parent; or (b) at the very least, positioned the best interest instruction in such a manner that it was unclear to the jury that the instruction applied to all the termination grounds alleged against both parents. In any event, neither party objected to the charge on the basis that it failed to include an instruction that termination under any ground alleged must also be in the child's best interest. The jury returned a verdict terminating parental rights for all three children, and the trial court rendered judgment based on the verdict.
On appeal, the parents argued for the first time that the broad-form submission and disjunctive questions in the charge violated their due process rights. The parents also complained for the first time that the charge failed to instruct the jury that, to terminate under any ground alleged, the jury must also find that termination is in the best interest of the children.
The court of appeals held that, in parental-termination cases, applying Rule 33.1 of the Rules of Appellate Procedure to preclude an appellate court from reviewing an unpreserved complaint about "core issues" in the jury charge does not afford the parent due process. 57 S.W.3d 66, 72. See also Tex.R.App. P. 33.1(a) (As a prerequisite for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion in compliance with Texas's civil and appellate rules.). The court of appeals then reviewed the alleged errors and held the broad-form jury charge was proper. 57 S.W.3d at 73-74. After determining *300 the charge omitting a best interest instruction for all the termination grounds alleged was harmful error, the court of appeals reversed the trial court's judgment and remanded the case for a new trial. 57 S.W.3d at 74-75.

II. ANALYSIS
The parents contend that their constitutional argument about the best interest instruction in the jury charge involves their substantivenot proceduraldue process rights. According to the parents, the Family Code's procedural guarantees, such as the requirement that termination be in the best interest of the children, are meaningless unless appellate review is afforded to ensure the lower court correctly applied these procedures.
In County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the U.S. Supreme Court explained the meaning of procedural and substantive due process.
We have emphasized time and again that "the touchstone of due process is protection of the individual against arbitrary action of government," Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, see, e.g., Fuentes v. Shevin, 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, e.g., Daniels v. Williams, 474 U.S. [327,] at 331, 106 S.Ct. [662] at 664 [(1986)] (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).
Lewis, 523 U.S. at 845-46, 118 S.Ct. 1708 (citations to Supreme Court Journal omitted and full cite to Daniels provided).
Here, the nature of the parents' due process argument demonstrates that they are in fact making a procedural due process claim. The parents repeatedly rely on the U.S. Supreme Court's analysis for determining whether parents' due process rights have been met in termination cases. See Lassiter v. Dep't of Soc. Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). And the parents consistently claim that the procedurethat is, receiving no appellate review of alleged jury-charge errors because of the failure to preserve errorviolated their due process rights. See Daniels, 474 U.S. at 340-41, 106 S.Ct. 662 (Stevens, J., concurring) (explaining that petitioners asserted procedural and not substantive due process violations, because they alleged the state procedures for redressing deprivations of prisoners' property were constitutionally inadequate). However, the parents do not contend that the action by which the State terminates parental rights is arbitrary or oppressive. See Daniels, 474 U.S. at 331, 106 S.Ct. 677 (substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them and prevents the government from using its power for oppression). Indeed, the court of appeals treated the parents' complaint about the refusal to review unpreserved jury-charge error as a procedural due process issue. 57 S.W.3d at 72. And, the court of appeals applied the U.S. Supreme Court's procedural due process analysis to conclude that "[t]o terminate parental rightsa Fourteenth Amendment liberty interestwhen there is a fundamentally erroneous charge on a `core issue,' only because the complaint was not preserved in the trial court, does not adhere to Fourteenth Amendment procedural due process." Id. (emphasis added).
*301 Accordingly, the court of appeals correctly concluded that procedural, not substantive, due process is at issue here. However, for several reasons, the court of appeals' rationale for concluding that such due process requires review of the parents' unpreserved jury-charge errors is flawed. As discussed in detail below, the court of appeals misplaces its reliance on Texas case law, misapplies our strict scrutiny directive from Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985), and conducts an erroneous due process analysis to conclude our error preservation rules deny the parents due process in this case.

A. WHETHER DUE PROCESS REQUIRES APPELLATE REVIEW OF UNPRESERVED JURY-CHARGE ERRORS

1. Reliance on Texas Case Law
In holding that our error preservation rules do not preclude the court from reviewing the parents' jury-charge complaints raised for the first time on appeal, the court of appeals relied on two cases. 57 S.W.3d at 71-72 (discussing In re A.P., I.P., 42 S.W.3d 248 (Tex.App.-Waco 2001, no pet.) and In re S.R.M., 601 S.W.2d 766 (Tex.Civ.App.-Amarillo 1980, no writ)). But these cases do not support the court of appeals' conclusion.
In S.R.M., the evidence conclusively showed the mother's parental rights should not be terminated for the ground alleged. In re S.R.M., 601 S.W.2d at 768-69. However, the trial court rendered a judgment terminating the mother's parental rights based on grounds not pleaded. Id. at 769. The mother argued the court of appeals should reverse the trial court's judgment, because it relied on unpleaded grounds to terminate her parental rights. Id. The paternal grandparents seeking termination argued the mother impliedly consented to a trial on unpleaded grounds, because she did not specially except or object to the introduction of evidence related to the unpleaded grounds. Id. Because the Family Code mandates that the petition set forth the statutory grounds for termination to afford the parents due process, and because the record showed the mother had no notice that the trial court would consider terminating on unpleaded statutory grounds, the court of appeals reversed the trial court's judgment. Id. at 770.
Here, unlike the circumstances in S.R.M. in which the mother had no notice of the trial court's action, the parents knew about the jury charge and had an opportunity to object. See Id. In fact, though the parents' attorney did not object to the omission or placement of the best interest instruction, he did object to the definition of the clear and convincing evidentiary standard in the charge. And, because the trial court considered objections to the charge before the parents rested, their attorney specifically requested that everyone agree the objection would not be considered waived if he did not urge it again before closing arguments. Their counsel said, "I just don't want at some future time someone to write that I waived that objection." Thus, the parents had notice and an opportunity to object to the charge and acknowledged the consequences if they failed to do so.
In A.P., the court of appeals was asked to review unpreserved factual and legal sufficiency complaints about the grounds for termination and whether termination was in the best interest of the child. 42 S.W.3d at 254-55. The court of appeals cited S.R.M. as precedent for considering unpreserved error and held that terminating parental rights without appellate review of an unpreserved sufficiency complaint is a due process violation. 42 S.W.3d at 255. Then, the court of appeals referred to criminal cases, which have held *302 that a defendant does not have to preserve for appellate review a complaint that the evidence is factually or legally sufficient. 42 S.W.3d at 255-56 (citing Chesnut v. State, 959 S.W.2d 308, 311 (Tex.App.-El Paso 1997, no pet.); Davila v. State, 930 S.W.2d 641, 649 n. 7 (Tex.App.-El Paso 1996, writ ref'd)). Because criminal cases and termination cases both require heightened burdens of proof"beyond a reasonable doubt" in criminal cases and "clear and convincing" in termination casesthe A.P. court concluded it a "logical extension" to review unpreserved sufficiency issues in termination cases. 42 S.W.3d at 256.
But the A.P. court wholly failed to conduct a due process analysis, as the U.S. Supreme Court requires in parental-termination cases, to determine if the procedure for preserving sufficiency challenges violates parents' due process rights. See Lassiter, 452 U.S. at 27-28, 101 S.Ct. 2153. Instead, the court summarily cited S.R.M., without recognizing its significantly distinguishable facts, to support its conclusion that it could review the unpreserved error. Moreover, the A.P. court improperly relied on criminal cases that only opine about how defendants may raise sufficiency points and, in any event, operate under different procedural rules and jurisprudence. Accordingly, A.P., which should be overruled based on its erroneous analysis and holding, does not support the court of appeals' conclusion here that due process requires appellate courts to consider unpreserved jury-charge errors.

2. Strict Scrutiny
The court of appeals further explained that this Court's directive that "`termination proceedings should be strictly scrutinized' "justified its reviewing the unpreserved jury-charge errors. 57 S.W.3d at 72 (quoting Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985)). However, the strict scrutiny language in Holick only speaks to the important nature of the interests involved in parental-termination cases and does not support a conclusion that reviewing courts must consider unpreserved jury-charge errors.
In Holick, this Court determined how to construe a particular ground for termination in the Family Code. Holick, 685 S.W.2d at 19-20. Before answering the question, the Court discussed the fundamental constitutional rights involved in parental-termination proceedings. 685 S.W.2d at 20. After recognizing these rights, and the fact that a clear and convincing evidentiary standard applies in these cases, the Court explained that this is why "termination proceedings should be strictly scrutinized...." Id.
Since Holick, courts of appeals have cited the strict scrutiny language when generally discussing the standard of review principles that apply in termination cases. See, e.g., In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ). Further, courts of appeals have relied on the language to support the application of a heightened factual sufficiency review standard. See In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (discussing various courts of appeals decisions attempting to define the factual sufficiency review standard when clear and convincing evidence is required). However, other than the decisions in A.P. and here, no courts of appeals have relied on Holick's strict scrutiny directive to justify review of unpreserved error.
In sum, there is no indication the Court ever intended Holick's strict scrutiny language to support appellate review of unpreserved jury-charge errors. In fact, this Court recently rejected relying on Holick's strict scrutiny language as a basis for reversing a parental-termination judgment based on a parent's due process claim. *303 See In re K.R., 63 S.W.3d 796, 800, n. 20 (Tex.2001). In K.R., the Court considered a parent's argument that procedural due process precludes a reviewing court from applying a harmless error analysis to his claim that his being handcuffed throughout the trial improperly prejudiced the jury. Id. at 798. The Court held that, while it agreed "that judgments terminating the parent-child relationship must be carefully scrutinized because of the importance of that relationship, [it could not] conclude that the Fourteenth Amendment requires reversal of the judgment in this case without regard to harm." Id. at 800. The Court explained that, even in criminal cases, the U.S. Supreme Court has rejected the notion that any constitutional error requires automatic reversal. Id. To the contrary, if "trial errors" such as "errors in the charge and in evidentiary rulings" occur, courts may not reverse the judgment unless the error caused harm. Id.
Accordingly, Holick's strict scrutiny language does not dictate procedure. The language simply evidences this Court's recognition of the important interests involved in parental-termination proceedings. See Holick, 685 S.W.2d at 20.

3. United States Supreme Court Due Process Analysis
The court of appeals additionally determined that appellate review of the parents' unpreserved jury-charge errors "comports with the requirements in Lassiter." 57 S.W.3d at 72. However, if all the pertinent factors are properly considered and weighed, the Lassiter due process test does not support the court of appeals' conclusion.
In Lassiter, the U.S. Supreme Court held that due process does not require states to provide indigent parents counsel in all termination cases. Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153. Before answering the due process question, the U.S. Supreme Court explained the nebulous nature of this concept:
"[D]ue process" has never been, and perhaps can never be, precisely defined.... Rather, the phrase [due process] expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.
Lassiter, 452 U.S. at 24-25, 101 S.Ct. 2153.
The U.S. Supreme Court then held that the nature of the process due in parental-termination proceedings depends upon a balancing of three factors: (1) the private interests at stake; (2) the government's interests; and (3) the risk that the procedures used will lead to an erroneous deprivation. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153 (relying on Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); see also see also Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Once these Eldridge factors are weighed against each other, the court must next "set their net weight in the scales against the presumption" that the procedure applied did not violate due process. Id.
Here, the analysis begins with the presumption that our rules governing preservation of jury-charge error comport with due process. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. But this must be balanced against the net weight of the three Eldridge factors to determine if the presumption is overcome. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at *304 335, 96 S.Ct. 893. With respect to the first Eldridge factorthe private interests at stakethis Court has long recognized that the "natural right existing between parents and their children is of constitutional dimensions." Holick, 685 S.W.2d at 20; see also In re G.M., 596 S.W.2d 846, 846 (Tex.1980). A parent's right to the parent-child relationship is "`essential,' `a basic civil right of man,' and `far more precious than property rights.'" Holick, 685 S.W.2d at 20 (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Similarly, the U.S. Supreme Court has noted, "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.
However, the child's interests are also necessarily involved and must be considered in this analysis. The Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest. See, e.g., Tex. Fam.Code §§ 51.11(b); 153.001; 153.002; 161.001(2); 161.101. And, like their parents, children have an interest in an accurate resolution and just decision in termination cases. But children also have a strong interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged. In fact, it is this State's express policy to provide a safe, stable, and nonviolent environment for the child. Tex. Fam.Code § 153.001(a)(2). And, if error is properly preserved, the Legislature has upheld this interest by requiring prompt appellate decisions: "An appeal in a suit in which termination of the parent-child relationship is in issue shall be given precedence over other civil cases and shall be accelerated by the appellate courts." Tex. Fam.Code § 109.002(a). Similarly, Texas's preservation of error rules promote the child's interest in a final decision and thus placement in a safe and stable home, because they preclude appellate courts from unduly prolonging a decision by appellate review of issues not properly raised in the trial court.
Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such a magnitude that time is of the essence:
It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.
Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 513-14, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also Lassiter, 452 U.S. at 32, 101 S.Ct. 2153 ("[C]hild-custody litigation must be concluded as rapidly as is consistent with fairness...."). Accordingly, under the first Eldridge factor, the private interests reflect a desire for an accurate and just decision, but one that does not unduly prolong a final decision about the child's permanent home.
The second factor under Eldridge is the State's interests. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Undoubtedly, the State shares the parents' and child's interests in an accurate and just decision. See Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, the child's best interest is always the State's primary concern in termination proceedings. See Tex. Fam.Code §§ 161.001(2); 161.101. Thus, the State additionally shares the child's interest in not *305 unduly prolonging a final decision about the child's future. See Lehman, 458 U.S. at 513, 102 S.Ct. 3231 ("The State's interest in finality is unusually strong in child-custody disputes."); see also Tex. Fam. Code §§ 109.002(a) (giving appeals in parental-termination cases precedence over other civil cases); 161.202 (court shall grant motion for a preferential setting for a final termination hearing on the merits if termination would make the child eligible for adoption).
Additionally, the State has an interest in courts consistently and uniformly applying our preservation of error rules. This interest does not merely reflect a fiscal policy. Without uniform application of our error preservation rules, termination proceedings would be conducted and reviewed in an arbitrary manner. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." Eldridge, 424 U.S. at 348, 96 S.Ct. 893. Here, the cost of disregarding our error preservation rules risks not only unduly prolonging termination proceedings but also losing any predictability for the State, counsel for parents, and guardians for children about how courts will conduct and review these proceedings. Consequently, under the second factor, the State's interests encompass all the private interests, but weigh in favor of conducting termination proceedings under our error preservation rules so that the proceedings are not unduly prolonged or unpredictable.
Finally, the third Eldridge factor to consider is the risk that our rules for preserving error about the jury charge will lead to an erroneous deprivation. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Texas Rules of Civil Procedure 272-274 establish the procedures for parties to participate in the formulation of the jury charge. Tex.R. Civ. P. 272-274. Rule 272 requires a party to object to the charge, either orally or in writing, before the court reads the charge to the jury. Tex.R. Civ. P. 272. A party objecting to the charge must point out distinctly the objectionable matter and the grounds for the objection. Tex.R. Civ. P. 274. In addition to objecting to the charge, either party may request the trial court to submit certain questions, definitions, and instructions in the charge. Tex.R. Civ. P. 273. If a party fails to timely abide by the rules concerning the jury charge, the party waives any complaint on appeal. Tex.R. Civ. P. 273-74; Tex.R.App. P. 33.1(a).
This Court has relaxed the jury-charge preservation rules in an effort to determine cases on the merits rather than on slight technical defects. See State Dep't. of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.1992). In Payne, the Court held that, although the State requested an improperly worded jury-charge instruction, it was sufficient to preserve error. Id. at 241. The Court explained that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle." Id.
Accordingly, parties have various opportunities to formulate the jury charge and preserve error about the charge before the trial court reads it to the jury. Tex.R. Civ. P. 273-74. And, after Payne, a party need only timely and plainly make the trial court aware of a complaint to preserve such error. Payne, 838 S.W.2d at 241. *306 Consequently, Texas's rules for preserving jury-charge error raise little risk of erroneous deprivations.
To summarize the Eldridge factors, then: (1) the parents' interest is extremely important, but must be balanced with the child's important interests for not only an accurate and just decision but also finality and placement in a stable home; (2) the State shares both the parents' and child's interests in an accurate and just decision, but the State's interest in not unduly prolonging finality and in uniformity and predictability in applying our preservation of error rules is stronger; and (3) the risk of an erroneous deprivation under our rules about preserving error in the jury charge is low, because parties have notice and an opportunity to be heard about issues submitted and omitted from the charge, and error is preserved so long as the party timely and plainly made the trial court aware of the party's complaint. Weighing these factors' net weight against the presumption that our error preservation rules comport with due process, it cannot be said that the parents' were not afforded due process here so that appellate review of their unpreserved jury-charge errors is warranted.
In fact, the record supports the conclusion that the parents' due process rights were not violated. The parents had an opportunity to be heard and object to the charge. Eldridge, 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'") (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). As previously discussed, the parents' counsel objected to a portion of the charge not challenged on appeal. And, in making this objection, their counsel expressly acknowledged the risk involved in failing to object in a timely manner. For these reasons, under Lassiter analysis, the court of appeals erroneously relied upon due process considerations to review the parents' unpreserved jury-charge errors.
An additional factor further supports the conclusion that due process does not require appellate review of the unpreserved jury-charge errors. Texas's Legislature has established the procedures for terminating parental rights. See Tex. Fam.Code §§ 161.001-161.211. In doing so, the Legislature has been heedful of the important interestsparents' and children'sat stake. For example, the Family Code expressly requires that a court terminate the parent-child relationship only if the grounds for termination, including whether termination is in the best interest of the child, are proven with "clear and convincing evidence." Tex. Fam.Code § 161.001. This, of course, is a higher evidentiary standard than in ordinary civil case. See In re G.M., 596 S.W.2d at 847. Moreover, though the U.S. Supreme Court has held that states need not do so in every case, the Family Code requires courts to provide counsel for indigent parents in termination proceedings. Tex. Fam.Code § 107.013(a)(1); see Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153.
Neither the Family Code passed by our Legislature nor the procedural and appellate rules promulgated and applied by our courts deny parents fair notice and the right to be heard in parental-termination cases. The U.S. Supreme Court has recognized that, "[i]n assessing what process is due ... substantial weight must be given to the good-faith judgments" of our law makers "that the procedures they have provided assure fair consideration of entitlement claims of individuals." Eldridge, 424 U.S. at 349, 96 S.Ct. 893. Here, our Legislature has carefully constructed a statutory scheme governing how courts *307 shall conduct termination proceedings. In that scheme, though the Legislature has expressly provided certain procedures that differ from other civil cases, see Tex. Fam. Code §§ 107.013(a)(1), 161.001, it has chosen not to preclude application of our procedural and appellate rules in parental-termination cases. Therefore, substantial weight should be given to the Legislature's good-faith judgment when deciding these cases. See Eldridge, 424 U.S. at 349, 96 S.Ct. 893.

B. INEFFECTIVE ASSISTANCE OF COUNSEL
As the Court recognizes, the parents complain that their counsel's failure to object to the charge and other alleged mistakes rendered his assistance ineffective. Assuming the parents may raise this contention, and assuming they may do so for the first time on appeal, the Court correctly concludes that the assistance in this case was not ineffective. In fact, even assuming the parents can overcome the strong presumption that their counsel's performance was reasonable, there is no reasonable probability that, but for their counsel's unprofessional errors, the result of this termination proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Garcia v. State, 57 S.W.3d 436, 440 (Tex.Crim.App.2001).
As discussed at length in the Court's opinion, the jury heard abundant evidence that supports a conclusion that termination is in the children's best interest. Further, given the all evidence the jury considered from numerous sources and witnesses, the counsel's alleged mistakes do not raise even "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Thus, the assistance of the parents' counsel in this case was not ineffective.

C. The Court's Writings
The Court engages in procedural gymnastics to avoid answering the constitutional question in this case. While Rule 279 may indeed resolve the specific alleged problem with the jury charge in this case, the Court refuses to answer the threshold procedural due process question and does not analyze the due process issue under the U.S. Supreme Court's guidelines for ascertaining the process due in termination proceedings. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. Because the Court does not answer the threshold constitutional question, the Court's writing leaves little guidance for practitioners and lower courts for how to determine if our error preservation rules violate due process when applied to other types of unpreserved errors. Undoubtedly, the Court must eventually resolve this issue, as there will not be a Rule 279 "band-aid" for every unpreserved trial error in parental-termination cases.
Justice Hankinson's fundamental error analysis is no more compelling. The fundamental-error analysis disregards that the parents' due process claim here relates to our procedures about preserving error for appeal. And, the U.S. Supreme Court has dictated how courts must determine what process is due a parent. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, rather than conduct this analysis, the dissent contends that our common law doctrine of fundamental error applies. But this disregards the true natureand dangerof Texas's fundamental error jurisprudence.
Historically, courts have applied fundamental error in civil cases under very limited circumstances. Typically, as the dissent recognizes, the concept of fundamental error is expressed in our jurisprudence *308 holding that subject-matter jurisdiction may be raised at any time. See, e.g., Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 445 (Tex. 1993). However, the other types of civil cases applying fundamental errorthe cases involving "public-interest-based" issuesare rare. Again, as the dissent recognizes, this Court has often declined to apply fundamental-error review, recently doing so in a case in which a child's welfare and constitutional issues were raised. See, e.g., Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001).
Perhaps the Court has not applied fundamental-error review in many cases, because the concept is nebulous and imprecise. This Court has held that fundamental error exists if the error "directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state." Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979, 983 (1947). But under this test, an argument may be made under almost any statute that public policy favors reviewing the unpreserved issue.
Moreover, under the dissent's analysis, if courts can review unpreserved jury-charge errors based on the Family Code expressing a public policy that the child's best interest is of primary concern, then courts can review any unpreserved error in parental-termination cases. In other words, a logical extension of the dissent's applying fundamental-error review here is that appellate courts must review any unpreserved error in a parental-termination case, because any error could affect the public's overarching concern with the child's best interest. Thus, fundamental-error review results in a slippery slope that, for all the reasons under the Eldridge factors adopted in Lassiter and discussed above, would cause more harm than good in termination cases.

III. CONCLUSION
The question the Court is asked to answer today is whether due process requires an appellate court to review unpreserved errors in the jury charge. The answer is "no." I cannot join the Court's opinion, because it declines to answer this question and instead relies on a procedural rule that gives no guidance for future cases. Moreover, the parents raised other issues the court of appeals did not consider, including a challenge to the factual sufficiency of the evidence. Accordingly, the court of appeals' judgment should be reversed and remanded to that court for further proceedings.
NOTES
[1] 57 S.W.3d 66.
[2] See Tex. Fam.Code § 262.104.
[3] See Tex. Fam.Code § 262.105.
[4] See Tex. Fam.Code § 262.201.
[5] 57 S.W.3d at 72.
[6] Id. at 73.
[7] Id.
[8] Id. at 73-74.
[9] 57 S.W.3d at 75-76 (Gray, J., dissenting).
[10] Texas Rule of Civil Procedure 279, embodying these concepts, was promulgated in 1941. It essentially tracked the holding in Wichita Falls & Oklahoma Railway Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79 (1940).
[11] Rule 279 provides:

Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment. A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant.
Tex.R. Civ. P. 279.
[12] See id.
[13] Id.
[14] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).
[15] Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re G.M., 596 S.W.2d 846, 847 (Tex.1980).
[16] See, e.g., State v. Addington, 588 S.W.2d 569, 570 (Tex.1979) (following Addington v. Texas, 441 U.S. 418, 431-32, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)) (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought); Bentley v. Bunton, 94 S.W.3d 561, 597 (Tex.2002) (defining "clear and convincing evidence" in a defamation case); Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 422 (Tex. 2000) (same).
[17] See Act of June 14, 1983, 68th Leg., R.S., ch. 298, § 2, 1983 Tex. Gen. Laws 1554, 1555 (former Tex. Fam.Code § 11.15) recodified by Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 212 (current version at Tex. Fam.Code §§ 161.001(1), (2)).
[18] Tex. Fam.Code § 101.007; In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (discussing this Court's and the Legislature's use of the same definition of "clear and convincing evidence"); see also Bentley v. Bunton, 94 S.W.3d at 597 (defining "clear and convincing evidence" in a defamation case) (citing Huckabee v. Time Warner Entertainment Co., 19 S.W.3d at 422); State v. Addington, 588 S.W.2d at 570 (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought).
[19] See In re C.H., 89 S.W.3d at 25 n. 1; see also Bentley v. Bunton, 94 S.W.3d at 577.
[20] In re C.H., 89 S.W.3d at 25.
[21] Id.
[22] Id. at 26.
[23] Id. at 25.
[24] Id. (citations omitted).
[25] Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (citing Continental Coffee Products Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.1996) and Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.1993)).
[26] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[27] 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).
[28] Jackson, 443 U.S. at 320, 99 S.Ct. 2781 (quoting Jacobellis v. Ohio, 378 U.S. 184, 202, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Warren, C.J., dissenting)).
[29] Id.
[30] Id.
[31] Id. at 320 n. 14 (citations omitted).
[32] See generally Stewart v. Coalter, 48 F.3d 610, 613-14 (1st Cir.1995).
[33] This standard is similar, but not identical, to the formulation used by federal courts in criminal cases to determine whether the defendant is entitled to a directed verdict of acquittal under the reasonable doubt standard of proof. See generally Curley v. United States, 160 F.2d 229, 232-33 (D.C.Cir.1947); United States v. Taylor, 464 F.2d 240, 243 (2nd Cir.1972); see also 2A Wright & Miller, Federal Practice and Procedure § 467 (3rd ed.2000).
[34] See Southwest Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 270 (Tex.2002) (rendering judgment against the plaintiff in a negligence case when there was legally insufficient evidence of proximate cause); Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176-77 (Tex. 1986) (holding that rendition is proper when a no evidence point is sustained); see also In re D.T., 34 S.W.3d 625, 642 (Tex.App.-Fort Worth 2000, pet. denied) (partially rendering judgment for the parents in a termination case because the evidence was legally insufficient to support findings on two statutory grounds for termination).
[35] In re C.H., 89 S.W.3d 17, 25 (Tex.2002).
[36] Id.
[37] The parameters of legal and factual sufficiency that we have set forth for parental termination cases differ to some degree from those adopted by the Texas Court of Criminal Appeals for criminal cases. See, e.g., Vasquez v. State, 67 S.W.3d 229, 236 (Tex.Crim.App. 2002).
[38] 89 S.W.3d 17 (Tex.2002).
[39] See W.B. v. Tex. Dep't of Protective & Regulatory Servs., 82 S.W.3d 739, 741 (Tex.App.-Corpus Christi 2002, no pet.); In re J.M.M., 80 S.W.3d 232, 240 (Tex.App.-Fort Worth 2002, pet. denied); In re A.L.S., 74 S.W.3d 173, 178 (Tex.App.-El Paso 2002, no pet.); In re R.G., 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.); In re L.S.R., 60 S.W.3d 376, 378 (Tex.App.-Fort Worth 2001, pet. denied); In re A.V., 57 S.W.3d 51, 61-62 (Tex.App.-Waco 2001, pet. granted); In re J.O.C., 47 S.W.3d 108, 113 (Tex.App.-Waco 2001, no pet.); In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.); In re V.R.W., 41 S.W.3d 183, 190 (Tex. App.-Houston [14th Dist.] 2001, no pet.); In re J.M.T., 39 S.W.3d 234, 238 (Tex.App.-Waco 1999, no pet.); Leal v. Tex. Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 321 (Tex. App.-Austin 2000, no pet.) (stating that a heightened standard applies, but actually applying "more than a scintilla" standard); In re P.R., 994 S.W.2d 411, 415 (Tex.App.-Fort Worth 1999, pet. dism'd w.o.j.); In re J.N.R., 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no pet.); In re W.A.B., 979 S.W.2d 804, 806 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); Hann v. Tex. Dep't of Protective & Regulatory Servs., 969 S.W.2d 77, 82 (Tex.App.-El Paso 1998, pet. denied); In re D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied); In re B.R., 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ); Lucas v. Tex. Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied); Edwards v. Tex. Dep't of Protective & Regulatory Servs., 946 S.W.2d 130, 137 (Tex.App.-El Paso 1997, no writ); Spurlock v. Tex. Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re J.F., 888 S.W.2d 140, 141 (Tex.App.-Tyler 1994, no writ); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ); D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 353 (Tex.App.-Austin 1993, no writ); In re L.R.M., 763 S.W.2d 64, 67 (Tex. App.-Fort Worth 1989, no writ).
[40] In re C.D.B., 94 S.W.3d 306, 308-09 (Tex. App.-Corpus Christi 2002, no pet. h.); In re W.C., 56 S.W.3d 863, 867-68 (Tex.App.-Houston [14th Dist.] 2001, no pet.); Rodriguez v. Tex. Dep't of Human Servs., 737 S.W.2d 25, 26-27 (Tex.App.-El Paso 1987, no writ); Subia v. Tex. Dep't of Human Servs., 750 S.W.2d 827, 831 (Tex.App.-El Paso 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 836 (Tex.App.-Dallas 1982, no writ).
[41] 89 S.W.3d at 25.
[42] Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Bose Corp. v. Consumers Union, 466 U.S. 485, 515-16, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).
[43] Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).
[44] 491 U.S. at 685-86, 109 S.Ct. 2678.
[45] 466 U.S. at 515-16, 104 S.Ct. 1949.
[46] 768 S.W.2d 273 (Tex.1989).
[47] 764 S.W.2d 220, 223 (Tex.1988).
[48] Garza, 768 S.W.2d at 275-76.
[49] Brown, 764 S.W.2d at 223.
[50] Garza, 768 S.W.2d at 276.
[51] U.S. Const. amend. XIV, § 1.
[52] Tex. Const. art. I, § 19.
[53] 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[54] Id. at 754, 102 S.Ct. 1388 (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).
[55] Id.
[56] Id. at 758-59, 102 S.Ct. 1388.
[57] Id. at 759, 102 S.Ct. 1388.
[58] Id.
[59] Id. at 754, 102 S.Ct. 1388.
[60] In re C.H., 89 S.W.3d 17, 25 (Tex.2002).
[61] 455 U.S. at 754, 102 S.Ct. 1388.
[62] See 96 S.W.3d at 307 (Schneider, J., dissenting).
[63] See id. at 291 (Hankinson, J., dissenting).
[64] See id. at 298 (Hankinson, J., dissenting).
[65] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).
[66] Tex.R. Civ. P. 279.
[67] Id.
[68] Tex.R. Civ. P. 299; see also Wisdom v. Smith, 146 Tex. 420, 209 S.W.2d 164, 166-67 (1948); Page v. Cent. Bank & Trust Co., 548 S.W.2d 802, 804 (Tex.Civ.App.-Eastland 1977, no writ); Gulf States Theatres of Tex. v. Hayes, 534 S.W.2d 406, 407 (Tex.Civ.App.-Beaumont 1976, writ ref'd n.r.e.); Go Int'l, Inc. v. Big-Tex Crude Oil Co., 531 S.W.2d 208, 210 (Tex. Civ.App.-Eastland 1975, no writ); Ives v. Watson, 521 S.W.2d 930, 934 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.).
[69] From 1941 until 1988, Rule 279 provided that if "there is evidence to support a finding," omitted findings would be "deemed as found by the court in such manner as to support the judgment." When that rule was amended in 1988, there was no indication in the record of the rules proceedings that revised Rule 279 was to meant to change the prerequisite of "evidence," which was maintained in Rule 299, to "factually sufficient" evidence with respect to deemed findings. But see Kilgarlin, Practicing Law in the "New Age": The 1988 Amendments to the Texas Rules of Civil Procedure, 19 Tex. Tech. L.Rev. 881, 916 (1988).
[70] See Tex.R.App. P. 33.1; see also Tex.R. Civ. P. 279.
[71] We express no opinion with regard to the holdings on this issue in the courts of appeals. See In re M.S., 73 S.W.3d 537, 542 (Tex.App.-Beaumont 2002, pet. granted) (holding that a sufficiency challenge must be preserved in the trial court in a parental termination case to be reviewed on appeal); In re G.C., 66 S.W.3d 517, 527 (Tex.App.-Fort Worth 2002, no pet. h.) (same); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.) (same); In re J.M.S., 43 S.W.3d 60, 62 (Tex. App.-Houston [1st Dist.] 2001, no pet.) (same); In re C.E.M., 64 S.W.3d 425, 428 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (same); In re A.P., 42 S.W.3d 248, 256 (Tex. App.-Waco 2001, no pet.) (holding that a factual sufficiency complaint in a parental termination case may be reviewed even though it was not preserved in the trial court); In re A.V., 57 S.W.3d 51, 56 (Tex.App.-Waco 2001, pet. granted) (same).
[72] The jury was instructed only that "[t]he same ten or more of you must agree upon all of the answers made and to the entire verdict." As can be seen from the charge, quoted in Section II, supra, the only questions to be answered were whether the parent-child relationships should be terminated.
[73] Tex.R.App. P. 44.1(a).
[74] The first order, a status hearing order, was signed on December 23, 1997. The next three orders, all permanency hearing orders, were signed on April 28, 1998, August 18, 1998, and December 15, 1998.
[75] The first order (signed in December 1997) did not order the mother to pay any child support, but ordered the father to pay $100. The remaining three orders directed each parent to pay $100.
[76] The parents had undergone individual psychological testing in 1997, before the children were removed, pursuant to the initial Child Safety Evaluation and Plan that CPS had implemented in April 1997. The psychiatric evaluations ordered after removal were to be new, additional evaluations that were distinct from the previous psychological testing.
[77] In re A.R.R., 61 S.W.3d 691, 695 (Tex.App.-Fort Worth 2001, pet. denied) (Sixth Amendment); In re B.B., 971 S.W.2d 160, 172 (Tex. App.-Beaumont 1998, pet. denied) (holding that the Sixth Amendment right does not extend to parental termination cases, although the parent contended the right to effective counsel stemmed from Tex. Fam.Code § 107.013); Arteaga v. Tex. Dep't of Protective & Regulatory Servs., 924 S.W.2d 756, 762 (Tex.App.-Austin 1996, writ denied) (Sixth Amendment); In re J.F., 888 S.W.2d 140, 143 (Tex.App.-Tyler 1994, no writ) (Sixth Amendment); Krasniqi v. Dallas County Child Protective Servs. Unit of Tex. Dep't of Human Servs., 809 S.W.2d 927, 931 (Tex.App.-Dallas 1991, writ denied) (Due process and equal protection under the Fourteenth Amendment); Posner v. Dallas County Child Welfare Unit of the Tex. Dep't of Human Servs., 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied) (holding that "the constitutional right to effective assistance of counsel" does not extend to parental termination proceedings without identifying any specific constitutional provision); Howell v. Dallas County Child Welfare Unit, 710 S.W.2d 729, 734-35 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).
[78] In re J.M.S., 43 S.W.3d 60, 62-63 (Tex. App.-Houston [1st Dist.] 2001, no pet.).
[79] Tex. Fam.Code § 107.103.
[80] In re B.L.D., 56 S.W.3d 203, 211-12 (Tex. App.-Waco 2001, pet. granted).
[81] In re Oghenekevebe, 123 N.C.App. 434, 473 S.E.2d 393, 396 (Ct.App.1996) (basing right on a statute); In re A.R.S., 480 N.W.2d 888, 891 (Iowa 1992) (holding that the test for ineffective assistance of counsel in termination cases is generally the same as in criminal proceedings); In re Adoption of T.M.F., 392 Pa.Super. 598, 573 A.2d 1035, 1041 (1990) (holding that "[t]he constitutional rights in a termination proceeding ... are derived from the due process clause of the fourteenth amendment of the United States Constitution and not the sixth amendment"); In re Simon, 171 Mich.App. 443, 431 N.W.2d 71, 74 (Ct.App.1988) (basing right on a statute).
[82] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[83] Id. at 686, 104 S.Ct. 2052.
[84] Id. at 687, 104 S.Ct. 2052.
[85] Id. at 688, 104 S.Ct. 2052.
[86] Id. at 689, 104 S.Ct. 2052 (alteration in original).
[87] Id.
[88] Id.
[89] Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
[90] Id. at 690, 104 S.Ct. 2052.
[91] Id.
[92] Id. at 691, 104 S.Ct. 2052.
[93] Id. at 693, 104 S.Ct. 2052.
[94] Id.
[95] Id.
[96] Id. at 694, 104 S.Ct. 2052.
[97] Id.
[98] Id. at 696, 104 S.Ct. 2052.
[99] Id.
[100] See Tex.R. Civ. P. 279.
[101] Strickland, 466 U.S. at 699, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
[102] See United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (holding that under Federal Rule of Appellate Procedure 52(b), "plain error" in a jury charge may be considered by an appellate court although it was not brought to the attention of the trial court); Pondexter v. State, 942 S.W.2d 577, 588 (Tex.Crim.App. 1996); Green v. State, 934 S.W.2d 92, 108 (Tex.Crim.App.1996); Ransom v. State, 920 S.W.2d 288, 303 (Tex.Crim.App.1994); Jackson v. State, 898 S.W.2d 896, 899 (Tex.Crim. App.1995).
[103] See State v. Santana, 444 S.W.2d 614, 615 (Tex.1969) (holding that a jury charge submitting preponderance of the evidence as the burden of proof was error that could be raised for the first time on appeal), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594 (1970); R.A.M. v. State, 599 S.W.2d 841, 844-45 (Tex.Civ.App.-San Antonio 1980, no writ).
[104] 802 S.W.2d 647 (Tex.1990).
[105] Strickland, 466 U.S. at 690, 104 S.Ct. 2052.
[106] 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[1] See, e.g., Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala.1986) (court may consider unpreserved error in closing argument only when so grossly improper and highly prejudicial so as to be beyond corrective action by trial court); Holiday Inns of Am., Inc. v. Peck, 520 P.2d 87, 90 (Alaska 1974) (court will consider "`plain error' that is likely to result in a miscarriage of justice"); Hale v. Morgan, 22 Cal.3d 388, 149 Cal.Rptr. 375, 584 P.2d 512, 516 (1978) (consideration of points not raised below permitted for important matters of public policy in which pure question of law is presented); Scheer v. Cromwell, 158 Colo. 427, 407 P.2d 344, 345 (1965) (in rare cases, court will notice manifest error); Collins v. Colonial Penn Ins. Co., 257 Conn. 718, 778 A.2d 899, 906 n. 14 (2001) (court will consider plain error when it is in the interest of the public welfare or justice between the parties); Wolhar v. General Motors Corp., 734 A.2d 161, 161, 1999 WL 485435 (Del.1999) (plain error is that which jeopardizes the fairness and integrity of the trial process); Newell v. District of Columbia, 741 A.2d 28, 34 (D.C.1999) (reversal for plain error when apparent from the face of the record that a miscarriage of justice has occurred); Murphy v. International Robotic Sys., 766 So.2d 1010, 1027 (Fla.2000) (court can consider unobjected-to, improper closing argument only when raised in a motion for new trial although rules require objection at trial); Foskey v. Foskey, 257 Ga. 736, 363 S.E.2d 547, 548 (1988) (listing types of cases in which court will reverse judgment based on unpreserved jury-charge error); Trucking Co. v. Board of Water Supply, 97 Hawai'i 450, 40 P.3d 73, 81 (2002) (appellate court has discretion to notice plain error in civil cases when justice requires); Hecla Mining Co. v. Star-Morning Mining Co., 122 Idaho 778, 839 P.2d 1192, 1197 (1992) (recognizing plain or fundamental error); Gillespie v. Chrysler Motors Corp., 135 Ill.2d 363, 142 Ill.Dec. 777, 553 N.E.2d 291, 297 (1990) (plain error considered when litigant cannot receive a fair trial and judicial process would deteriorate); Manns v. Skolnik, 666 N.E.2d 1236, 1241 (Ind.Ct.App.1996) (court will consider error that is substantial blatant violation of principles rendering the trial unfair); Berg v. Zummo, 786 So.2d 708, 716 n. 5 (La.2001) (court will consider "plain and fundamental error" in jury instructions); Reno v. Townsend, 704 A.2d 309, 311 (Me.1997) (obvious error affects fairness of proceedings); Squibb v. R.M. Bradley & Co., 40 Mass.App.Ct. 914, 661 N.E.2d 1352, 1353 (1996) (plain error is that which results in manifest injustice); Napier v. Jacobs, 429 Mich. 222, 414 N.W.2d 862, 871 (1987) (plain error is that which results in manifest miscarriage of justice); Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 727 (Miss.2001) (to reverse for plain error, court must find error and harm); Stanziale v. Musick, 370 S.W.2d 261, 269 (Mo. 1963) (court will reverse for manifest injustice or miscarriage of justice); State ex. rel State Comp. Mut. Ins. Fund v. Berg, 279 Mont. 161, 927 P.2d 975, 982 (1996) (plain-error doctrine permits review of error that results in substantial injustice); Barks v. Cosgriff Co., 247 Neb. 660, 529 N.W.2d 749, 754 (1995) (court will reach the merits of plain error in jury charge); Sunrise Manor Town Protective Ass'n v. City of N. Las Vegas, 91 Nev. 713, 541 P.2d 1102, 1104 (1975) (plain error is so substantial as to result in injustice); Fertile ex. rel. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 779 A.2d 1078, 1085 (2001) (the standard for plain error is whether error had clear capacity for producing unjust result); Chavez v. Board of County Comm'rs., 130 N.M. 753, 31 P.3d 1027, 1039 (Ct.App.2001) (fundamental error applies, for example, when there is no jurisdiction or issue is a matter of public interest affecting large number of people); Elezaj v. P.J. Carlin Constr. Co., 89 N.Y.2d 992, 657 N.Y.S.2d 399, 679 N.E.2d 638, 638 (1997) (only intermediate appellate court has discretion to review unpreserved error); Rau v. Kirschenman, 208 N.W.2d 1, 9 (N.D.1973)(recognizing exception to preservation rules for fundamental error that is highly prejudicial) (on petition for rehearing); Goldfuss v. Davidson, 79 Ohio St.3d 116, 679 N.E.2d 1099, 1103 (1997) (reversing plain error when, if uncorrected, it would undermine public confidence in judiciary); Sullivan v. Forty-Second West Corp., 961 P.2d 801, 803 (Okla.1998) (fundamental error has a substantial effect on rights of one or more of the parties); Hotelling v. Walther, 174 Or. 381, 148 P.2d 933, 934 (1944) (plain error is error apparent on the record); Wuest ex. rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 691 (S.D.2000) (errors must be obvious and substantial); Salt Lake City v. Ohms, 881 P.2d 844, 847 (Utah 1994) (court can review unpreserved error when exceptional circumstances exist); In re Maher, 132 Vt. 560, 326 A.2d 142, 144 (1974) (court will review errors so grave and serious as to strike to the heart of constitutional rights); Conner v. Universal Utils., 105 Wash.2d 168, 712 P.2d 849, 851 (1986) (court may review unpreserved issue regarding denial of procedural due process on appeal); Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC, 209 W.Va. 318, 547 S.E.2d 256, 273 (2001) (error must be plain, affect substantial rights, and seriously affect fairness of judicial proceedings); Hatch v. State Farm Fire & Cas. Co., 930 P.2d 382, 391 (Wyo.1997) (court must be able to discern error from record that affects substantial rights).
[1] The Family Service Plan is the trial court's order specifying the actions the parents had to take for the Department to return the children to their custody. See Tex. Fam.Code § 161.001(1)(o).